**IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF WEST VIRGINIA**

**CHARLESTON DIVISION**

**CECIL ALLEN FOSTER,**

     **Plaintiff,**

**v.**                          **Case No.: 2:14-cv-24973**

**CAROLYN W. COLVIN,
Acting Commissioner of the
Social Security Administration,**

     **Defendant.**

**PROPOSED FINDINGS AND RECOMMENDATIONS**

     This action seeks a review of the decision of the Commissioner of the Social Security Administration (hereinafter "Commissioner") denying Plaintiff's applications for a period of disability and disability insurance benefits ("DIB") and supplemental security income ("SSI") under Titles II and XVI of the Social Security Act, 42 U.S.C. §§ 401-433, 1381-1383f. The matter is assigned to the Honorable Thomas E. Johnston, United States District Judge, and was referred to the undersigned United States Magistrate Judge by standing order for submission of proposed findings of fact and recommendations for disposition pursuant to 28 U.S.C. § 636(b)(1)(B). Presently pending before the Court are Plaintiff's Motion for Judgment on the Pleadings and the Commissioner's brief in support of her decision requesting judgment in her favor. (ECF Nos. 7 & 9).

     Having fully considered the record and the arguments of the parties, the undersigned United States Magistrate Judge respectfully **RECOMMENDS** that the

presiding District Judge **GRANT** Plaintiff's Motion for Judgment on the Pleadings, to the extent that it requests remand of the Commissioner's decision, (ECF No. 7); **DENY** Defendant's request to affirm the decision of the Commissioner, (ECF No. 9); **REVERSE** the final decision of the Commissioner; **REMAND** this matter pursuant to sentence four of 42 U.S.C. § 405(g); and **DISMISS** this action from the docket of the Court.

## I.   <u>Procedural History</u>

On August 25, 2011 and December 14, 2011, Plaintiff Cecil Allen Foster ("Claimant"), filed applications for DIB and SSI, respectively, alleging a disability onset date of May 20, 2011, (Tr. at 159, 162), due to "back injury, depression, leg injury, neck injury, [and] shoulder injury." (Tr. at 184). The Social Security Administration ("SSA") denied Claimant's applications initially and upon reconsideration. (Tr. at 83, 88, 98, 105). Claimant filed a request for an administrative hearing, (Tr. at 112), which was held on May 7, 2013, before the Honorable William R. Paxton, Administrative Law Judge ("ALJ"). (Tr. at 44-78). By written decision dated May 30, 2013, the ALJ found that Claimant was not disabled as defined in the Social Security Act. (Tr. at 30-43). The ALJ's decision became the final decision of the Commissioner on August 5, 2014, when the Appeals Council denied Claimant's request for review. (Tr. at 1-4).

Claimant timely filed the present civil action seeking judicial review pursuant to 42 U.S.C. § 405(g). (ECF No. 1). The Commissioner subsequently filed an Answer opposing Claimant's complaint and a Transcript of the Administrative Proceedings. (ECF Nos. 5 & 6). Claimant then filed a Motion for Judgment on the Pleadings and a memorandum in support of that motion, (ECF Nos. 7 & 8), and the Commissioner filed a Brief in Support of Defendant's Decision, (ECF No. 9). Consequently, the matter is

fully briefed and ready for resolution.

## II.    **Claimant's Background**

Claimant was 36 years old at the time that he filed the application for DIB, 37 years old at the time that he filed the application for SSI, and 38 years old on the date of the ALJ's decision. (Tr. at 43, 159, 162). He has a high school education and communicates in English. (Tr. at 183, 185). Claimant has previously worked as a continuous mining machine operator and roof bolter or bolter operator. (Tr. at 57, 70-71, 185, 252).

## III.   **Summary of ALJ's Decision**

Under 42 U.S.C. § 423(d)(5), a claimant seeking disability benefits has the burden of proving a disability. *See Blalock v. Richardson,* 483 F.2d 773, 775 (4th Cir. 1972). A disability is defined as the "inability to engage in any substantial gainful activity by reason of any medically determinable impairment which has lasted or can be expected to last for a continuous period of not less than 12 months." 42 U.S.C. § 423(d)(1)(A).

The Social Security regulations establish a five-step sequential evaluation process for the adjudication of disability claims. If an individual is found "not disabled" at any step of the process, further inquiry is unnecessary and benefits are denied. 20 C.F.R. §§ 404.1520(a)(4), 416.920(a)(4). The first step in the sequence is determining whether a claimant is currently engaged in substantial gainful employment. *Id.* §§ 404.1520(b), 416.920(b). If the claimant is not, then the second step requires a determination of whether the claimant suffers from a severe impairment. *Id.* §§ 404.1520(c), 416.920(c). A severe impairment is one that "significantly limits [a claimant's] physical or mental ability to do basic work activities." *Id.* If severe impairment is present, the third inquiry

3

is whether this impairment meets or equals any of the impairments listed in Appendix 1 to Subpart P of the Administrative Regulations No. 4 (the "Listing"). *Id.* §§ 404.1520(d), 416.920(d). If so, then the claimant is found disabled and awarded benefits.

However, if the impairment does not meet or equal a listed impairment, the adjudicator must assess the claimant's residual functional capacity ("RFC"), which is the measure of the claimant's ability to engage in substantial gainful activity despite the limitations of his or her impairments. *Id.* §§ 404.1520(e), 416.920(e). After making this determination, the fourth step is to ascertain whether the claimant's impairments prevent the performance of past relevant work. *Id.* §§ 404.1520(f), 416.920(f). If the impairments do prevent the performance of past relevant work, then the claimant has established a *prima facie* case of disability, and the burden shifts to the Commissioner to demonstrate, in the fifth and final step of the process, that the claimant is able to perform other forms of substantial gainful activity, given the claimant's remaining physical and mental capacities, age, education, and prior work experiences. 20 C.F.R. §§ 404.1520(g), 416.920(g); *see also McLain v. Schweiker*, 715 F.2d 866, 868-69 (4th Cir. 1983). The Commissioner must establish two things: (1) that the claimant, considering his or her age, education, skills, work experience, and physical shortcomings has the capacity to perform an alternative job, and (2) that this specific job exists in significant numbers in the national economy. *McLamore v. Weinberger*, 538 F.2d 572, 574 (4th Cir. 1976).

When a claimant alleges a mental impairment, the SSA "must follow a special technique at each level in the administrative review process," including the review performed by the ALJ. 20 C.F.R. §§ 404.1520a(a), 416.920a(a). Under this technique, the ALJ first evaluates the claimant's pertinent signs, symptoms, and laboratory results

to determine whether the claimant has a medically determinable mental impairment. *Id.* §§ 404.1520a(b), 416.920a(b). If an impairment exists, the ALJ documents her findings. Second, the ALJ rates and documents the degree of functional limitation resulting from the impairment according to criteria specified in *Id.* §§ 404.1520a(c), 416.920a(c). Third, after rating the degree of functional limitation from the claimant's impairment(s), the ALJ determines the severity of the limitation. *Id.* §§ 404.1520a(d), 416.920a(d). A rating of "none" or "mild" in the first three functional areas (activities of daily living, social functioning, and concentration, persistence or pace) and "none" in the fourth (episodes of decompensation of extended duration) will result in a finding that the impairment is not severe unless the evidence indicates that there is more than minimal limitation in the claimant's ability to do basic work activities. *Id.* §§ 404.1520a(d)(1), 416.920a(d)(1). Fourth, if the claimant's impairment is deemed severe, the ALJ compares the medical findings about the severe impairment and the rating and degree and functional limitation to the criteria of the appropriate listed mental disorder to determine if the severe impairment meets or is equal to a listed mental disorder. *Id.* §§ 404.1520a(d)(2), 416.920a(d)(2). Finally, if the ALJ finds that the claimant has a severe mental impairment, which neither meets nor equals a listed mental disorder, the ALJ assesses the claimant's residual mental function. *Id.* §§ 404.1520a(d)(3), 416.920a(d)(3). The regulations further specify how the findings and conclusion reached in applying the technique must be documented by the ALJ, stating:

> The decision must show the significant history, including examination and laboratory findings, the functional limitations that were considered in reaching a conclusion about the severity of the mental impairment(s). The decision must include a specific finding as to the degree of limitation in each functional areas described in paragraph (c) of this section.

20 C.F.R. §§ 404.1520a(e)(4), 416.920a(e)(4).

Here, the ALJ determined as a preliminary matter that Claimant met the insured status for disability insurance benefits through December 31, 2016. (Tr. at 32, Finding No. 1). At the first step of the sequential evaluation, the ALJ confirmed that Claimant had not engaged in substantial gainful activity since May 20, 2011, the alleged disability onset date. (Tr. at 32, Finding No. 2). At the second step of the evaluation, the ALJ found that Claimant had the following severe impairments: "neurofibromatosis of the right thigh and right lower leg, neuropathic pain, history of rotator cuff tear of the right shoulder, chronic cervical and lumbar strain, major depressive disorder and generalized anxiety disorder." (Tr. at 32-33, Finding No. 3). The ALJ also considered Claimant's report of headaches, but found that this impairment was non-severe. (Tr. at 33).

Under the third inquiry, the ALJ found that Claimant did not have an impairment or combination of impairments that met or medically equaled any of the impairments contained in the Listing. (Tr. at 33-36, Finding No. 4). Accordingly, the ALJ determined that Claimant possessed:

> [T]he residual functional capacity to perform sedentary work as defined in 20 CFR 404.1567(a) and 416.967(a). He can occasionally perform balancing, kneeling, stooping, crouching and climbing of ramps and stairs, but may never perform climbing of ladders, ropes or scaffolds. He cannot operate foot controls or push and pull with the right lower extremity. He must avoid concentrated exposure to extreme cold, extreme heat, vibration and all hazards such as heights and machinery. He requires a sit/stand option and can sit 15 minutes at a time and stand 20 minutes at a time. He is limited to understanding, remembering and carrying out simple instructions.

(Tr. at 36-41, Finding No. 5). At the fourth step, the ALJ determined that Claimant was unable to perform any of his past relevant work. (Tr. at 41, Finding No. 6). Under the fifth and final inquiry, the ALJ reviewed Claimant's past work experience, age, and education in combination with his RFC to determine his ability to engage in substantial

gainful activity. (Tr. at 41-43, Finding Nos. 7-10). The ALJ considered that (1) Claimant was born in 1974, and was defined as a younger individual age 18-44 on the alleged disability onset date; (2) he had at least a high school education and could communicate in English; and (3) transferability of job skills was not material to the disability determination because the Medical-Vocational Rules supported a finding that Claimant was "not disabled," regardless of his transferable job skills. (Tr. at 41-42, Finding Nos. 7-9). Given these factors, Claimant's RFC, and the testimony of a vocational expert, the ALJ determined that Claimant could perform jobs that exist in significant numbers in the national economy, including work as a polisher, sorter, or bonder at the sedentary exertional level. (Tr. at 42-43, Finding No. 10). Therefore, the ALJ found that Claimant was not disabled as defined in the Social Security Act, and was not entitled to benefits. (Tr. at 43, Finding No. 11).

## IV.    <u>Claimant's Challenges to the Commissioner's Decision</u>

Claimant raises four challenges to the Commissioner's decision. (ECF No. 8 at 4-13). First, he insists that the ALJ's RFC determination is not supported by substantial evidence because it fails to take into account Claimant's manipulative limitations, fatigue, and right leg atrophy. (*Id.* at 5-6, 8-9, 12-13). With respect to his manipulative limitations, Claimant asserts that Miraflor Khorshad, M.D., found that Claimant experienced tremors in both hands along with decreased grip strength and upper extremity strength. (*Id.* at 5, 9-10). As for his right leg atrophy, Claimant points out that multiple physicians documented a difference in the circumference of Claimant's right leg and left leg, which was attributed to atrophy. (*Id.* at 12-13). In relation to his fatigue, Claimant asserts that he reported sleep disturbance to multiple examiners. (*Id.* at 6, 8-9).

In his second challenge, Claimant argues that the ALJ ignored or improperly evaluated the opinions of an examining physician, an examining psychologist, and a vocational rehabilitation specialist. Claimant contends that the ALJ failed to properly weigh the opinion of Dr. Khorshad that Claimant was unable to perform any work, and the opinion of Tony Goudy, Ph.D., that Claimant experienced marked impairment in concentration, persistence, or pace and that Claimant's psychological impairments would impact his ability to stay on task at work. (*Id.* at 9-12). Claimant also argues that the ALJ committed reversible error when he failed to address the opinion of Casey Vass, Rehabilitation Specialist, who determined that Claimant was unable to engage in gainful employment at any exertional level. (*Id.* at 4, 7-8).

Third, Claimant asserts that the ALJ erred when he found that Claimant's report of his symptoms was less than fully credible. (*Id.* at 6, 8-9, 11). Claimant emphasizes his testimony that he required frequent naps due to sleep disturbance and often dropped things due to numbness in his arms. (*Id.* at 5-6, 8). Moreover, Claimant alleges that he suffers from constant and severe pain caused by tumors attached to his sciatic nerve. (*Id.* at 11). Finally, Claimant argues that the ALJ erred when he concluded that the number of jobs identified by the vocational expert at the administrative hearing was significant. (*Id.* at 6-7).

In response, the Commissioner contends that the ALJ properly formulated Claimant's RFC. (ECF No. 9 at 12). In particular, the Commissioner asserts that the ALJ was not required to include manipulative limitations in Claimant's RFC given Dr. Khorshad's finding that Claimant was able to fully extend his hands, make a fist, and oppose his fingers. (*Id.* at 18). Additionally, the Commissioner notes that two state agency physicians concluded that Claimant possessed no manipulative limitations. (*Id.*)

In relation to Claimant's fatigue, the Commissioner alleges that Claimant denied experiencing chronic fatigue at an examination in 2011 and denied experiencing any medication side effects both to his treating physicians and in reports to the SSA. (*Id.* at 15).

In response to Claimant's second challenge, the Commissioner argues that the ALJ appropriately weighed the opinions of Dr. Khorshad and Dr. Goudy. (*Id.* at 15). The Commissioner points out that both Dr. Khorshad and Dr. Goudy are consultative examiners, and as such, their opinions are not entitled to controlling weight. (*Id.* at 16). With regard to Dr. Khorshad's opinion that Claimant was unable to perform full-time work, the Commissioner notes that this opinion relates to an issue reserved to the Commissioner. (*Id.*) Consequently, the Commissioner asserts that the ALJ properly rejected this opinion. (*Id.*) As for Dr. Goudy's opinion that Claimant had marked impairment in concentration and would have difficulty staying on task at work, the Commissioner insists that Dr. Goudy's opinion was inconsistent with his own findings at the examination, based on Claimant's less than fully credible description of his symptoms, contrary to the ALJ's observations at the administrative hearing, and in conflict with other opinion evidence. (*Id.* at 16-17). In relation to Mr. Vass's opinion, the Commissioner claims that Mr. Vass's conclusions invade the province of the Commissioner. (*Id.* at 20 n.6). Moreover, the Commissioner asserts that Claimant has failed to cite any authority requiring an ALJ to explicitly address a retained rehabilitation specialist's opinion in the written decision. (*Id.*)

As for Claimant's third challenge, the Commissioner argues that the ALJ provided multiple reasons for discounting Claimant's credibility, including Claimant's conflicting reports of past work experience, description of symptoms that were at odds

with objective medical findings or his own reports at medical appointments, failure to consistently seek mental health treatment, and unnecessary minimization of his daily activities. (*Id.* at 14-15). Finally, with respect to Claimant's fourth challenge, the Commissioner insists that the vocational expert identified jobs with several thousand positions available regionally, which certainly constitutes a significant number of jobs under the regulations. (*Id.* at 19).

## V.   <u>Relevant Medical Evidence</u>

The undersigned has reviewed all of the evidence before the Court, including the records of Claimant's health care examinations, evaluations, and treatment. The relevant medical information is summarized as follows.

### A. Treatment Records

On October 19, 2006, Claimant was transported to Montgomery General Hospital after being struck on the head by a canopy while working at a coal mine. (Tr. at 285). He complained of mild pain in his head, neck, and shoulder. (*Id.*) X-rays were obtained of Claimant's shoulders, which were negative. (Tr. at 293). A CT scan of Claimant's head was also found to be negative. (Tr. at 294). Claimant followed up with James Shumate, D.O., on November 14, 2006, with complaints of pain and swelling in his neck. (Tr. at 454). Although he denied weakness or numbness in his arms, he did complain of pain that radiated down into his upper thoracic region. (*Id.*) Claimant was assessed with cervical strain and closed head injury, and he was prescribed Lidoderm patches. (*Id.*)

On June 26, 2007, Claimant reported to Dr. Shumate that at night and when driving, his hands would "go numb," which caused him to experience problems with his grip. (Tr. at 376). Claimant also indicated that he experienced shoulder pain and neck problems. (*Id.*) Claimant subsequently underwent a nerve conduction/EMG evaluation

with Joe O. Othman, M.D., on July 3, 2007. (Tr. at 451-52). Dr. Othman found the tests of the upper extremities consistent with mild to moderate ulnar neuropathy at the level of the elbow on the left and borderline ulnar neuropathy at the level of the elbow on the right. (Tr. at 452). He found no evidence of a proximal lesion and recommended an elbow extension splint for use at night. (*Id.*)

On October 22, 2008, due to right popliteal neurofibromas, Claimant underwent an ultrasound of his popliteal space at Summersville Memorial Hospital. (Tr. at 432). The ultrasound revealed multiple well-circumscribed hypoechoic areas at the right popliteal fossa, which the interpreting physician opined might represent cysts with debris or soft tissue nodules. (*Id.*)

On February 4, 2010, Claimant underwent an MRI of his thigh at Summersville Regional Medical Center as ordered by Mark Goodman, M.D. (Tr. at 326). The MRI revealed probable sciatic nerve fibroadenomata. (*Id.*) Dr. Goodman recorded on February 19, 2010 that Claimant's right thigh exhibited neurofibromas running the entire length of the sciatic nerve up to the buttock crease, none of which appeared to be malignant. (Tr. at 318). Dr. Goodman advised Claimant that removing all of the neurofibromas would risk complete sciatic palsy and paralysis below the knee. (*Id.*) Claimant was advised that the tumor located at the popliteal fossa could be removed if it was causing issues. (*Id.*)

On February 28, 2010, Dr. Goodman noted that Claimant had agreed to undergo a resection of a schwannoma[1] located at the popliteal space. (Tr. at 322). Dr. Goodman noted the remainder of the schwannomas running up the sciatic nerve created a bigger

---

[1] A schwannoma is a benign tumor of the nerve sheath. A neurofibroma is a schwannoma. Farlex Partner Medical Dictionary © Farlex 2012.

issue and would be reviewed to ascertain if they could also be removed. (*Id.*) On March 17, 2010, Dr. Goodman performed an "excision of 4 neurofibromas, posterior tibial nerve – right leg, lysis of adhesions, perineural tissue right posterior tibial nerve." (Tr. at 324). On March 25, 2010, Dr. Goodman noted that Claimant was making a satisfactory recovery after surgery. (Tr. at 320). Claimant was permitted to increase activity as he was comfortable. (*Id.*) On May 27, 2010, Dr. Goodman reported to Dr. Shumate that Claimant had some limitation with range of motion in his right knee and that he walked with an antalgic gait. (Tr. at 319). However, Claimant's wound was unremarkable, and he appeared neurologically intact. (*Id.*) Dr. Goodman indicated that Claimant would require one month of intensive physical therapy before he could consider going back to work. (*Id.*)

On June 18, 2010, Claimant returned to Dr. Shumate. (Tr. at 400). Claimant reported that he was unable to fully straighten his right knee and that his leg would occasionally give out on him. (*Id.*) Claimant also described experiencing pain in his upper leg at the mid-thigh up into his pelvis. (*Id.*) While Claimant was prescribed Lyrica, Flexeril, and Hydrocodone, he stated that those medications did not fully relieve his pain. (*Id.*) Dr. Shumate increased Claimant's Lyrica dosage and prescribed Lidoderm patches. (*Id.*) The following month, Dr. Shumate noted that Claimant was doing much better and had increased his activity level. (Tr. at 399). Claimant also reported that his medication regimen had improved his pain and that he hoped to return to work in August after completing physical therapy. (*Id.*)

On August 3, 2010, Dr. Goodman recorded that Claimant was doing well, but still symptomatic due to persistent neural tumors. (Tr. at 317). Notwithstanding, Dr. Goodman opined that Claimant could return to work. (*Id.*) He noted that Claimant had

full range of motion in his right knee and good distal neurologic function. (*Id.*) Dr. Goodman indicated that Claimant's other neural tumors may require treatment at some point in the future. (*Id.*)

On September 7, 2010, Claimant reported to Dr. Shumate that he had returned to work, but he was experiencing pain in the right leg located predominately in the hip area. (Tr. at 398). Dr. Shumate increased Claimant's Lyrica dosage. (*Id.*) Later that month, Claimant informed Dr. Goodman that he was experiencing pain in his right lower extremity. (Tr. at 323). Dr. Goodman's examination revealed tenderness from Claimant's buttocks to below the surgical incision at the knee. (*Id.*) Claimant remained neurologically intact "for the most part." (*Id.*) Dr. Goodman felt that more surgery was not an option, particularly given the good motor function that Claimant exhibited. (*Id.*) Dr. Goodman recommended the use of spinal cord stimulation for long-term pain control. (*Id.*) The following month, Claimant returned to Dr. Shumate complaining that a large piece of coal fell on his head and jammed his neck. (Tr. at 396). Claimant reported no neurological symptoms in his arms, but did have a stiff neck and pain in that area. (*Id.*) Claimant also indicated that he continued to experience leg pain, but informed Dr. Shumate that he was working and wanted to continue to do so. (*Id.*) Dr. Shumate prescribed Percocet and discontinued Hydrocodone. (*Id.*)

On January 17, 2011, Claimant informed Dr. Shumate that the pain in his leg had improved with Lyrica and that his pain was under control. (Tr. at 394). Claimant also told Dr. Shumate that he fell on his right knee in December 2010 and experienced continued pain in the knee cap since that time. (*Id.*) An x-ray of Claimant's right knee that same day showed no obvious fracture, dislocation, or bony abnormality. (Tr. at 417).

On April 5, 2011, Dr. Shumate assessed Claimant with depression and anxiety after Claimant reported trouble dealing with personal issues. (Tr. at 390). Dr. Shumate prescribed Ativan for Claimant's stress and anxiety along with Lortab. (*Id.*) The following month, on May 6, 2011, Claimant informed Dr. Shumate that he was doing better since starting Lexapro and Ativan. (Tr. at 388). Claimant reported feeling much calmer even though he continued to experience a lot of stress. (*Id.*) According to Claimant, his manager at work insisted that Claimant had been late or absent from work when the time clock said Claimant was there. (*Id.*) This resulted in a three-day suspension from work. (*Id.*) Claimant again complained of severe leg pain and stated that he wanted to discuss treatment with a spinal cord stimulator, but he was unsure whether he could have the procedure given his work situation. (*Id.*) He denied experiencing crying spells or suicidal ideation. (*Id.*) Upon examination, Dr. Shumate noted that there was no edema in Claimant's extremities and that Claimant's mood and affect were bright. (*Id.*) Dr. Shumate diagnosed Claimant with depression with anxiety features and neurofibroma of the right leg. (*Id.*) Claimant was continued on his existing medication regimen, and he was referred to counseling for anxiety. (*Id.*)

Claimant returned to Dr. Shumate on June 1, 2011, reporting increased low back pain that radiated down his right leg. (Tr. at 386). Claimant stated that he was at work lifting a cable and he felt a pop in his back with immediate onset of right hip and leg pain. (*Id.*) Upon examination, Dr. Shumate observed no edema in Claimant's extremities. (*Id.*) A straight leg raise test was positive at forty-five degrees for the right leg. (*Id.*) Claimant was assessed with low back pain with right leg radiculopathy and neurofibromatosis. (*Id.*) Dr. Shumate opined that Claimant had a strained low back, but did not believe any neurologic impingement was present despite the positive straight leg

14

raise test. (*Id.*) Dr. Shumate found that conservative treatment was required, including chiropractic treatment and prescriptions for Lodine, Percocet, and Flexeril. (*Id.*)

Claimant again treated with Dr. Shumate one month later and reported back pain that radiated into his right hip and leg. (Tr. at 384). Dr. Shumate noted that the pain was different from the "normal" fibroma pain as Claimant had not experienced back pain prior to this work injury. (*Id.*) Claimant also reported assisting an elderly woman to change a tire on the way to his appointment, which aggravated his pain. (*Id.*) In addition, Claimant indicated that his leg occasionally gave out and that he had been fired from his job. (*Id.*) Dr. Shumate found that Claimant's strength was 5/5 upon neurological examination; however, a straight leg raise test on the right was positive at thirty degrees. (*Id.*) Dr. Shumate observed that Claimant's gait was antalgic and that spasm was present throughout the lumbar spine. (*Id.*) Dr. Shumate assessed Claimant with a lumbosacral sprain and right leg radiculopathy. (*Id.*) He continued Claimant on his existing medication regimen and advised him to limit his activity. (*Id.*)

On August 9, 2011, Claimant told Dr. Shumate that he continued to have low back pain radiating down his right leg and noticed new lesions near the site of prior surgery in the right popliteal area. (Tr. at 382). He described the back pain as so severe that he could barely sit down or ambulate more than twenty to thirty steps without bending over to rest his back. (*Id.*) Claimant reported that the medications helped, but they did not provide lasting relief. (*Id.*) Neurological examination showed strength at 5/5. (*Id.*) A musculoskeletal examination revealed several small nodules on the right calf that were tender. (*Id.*) Dr. Shumate recorded that Claimant had a large tumor on the right sciatic nerve that, according to Claimant's neurosurgeon, could not be corrected. (*Id.*) He prescribed Elavil and continued Claimant on his existing medication regimen. (*Id.*) Dr.

Shumate also noted that Claimant had applied for disability benefits for his "nerve problem." (*Id.*) He opined that if Claimant's neurofibromatosis issues could not be corrected, then Claimant would be limited to sedentary or light exertional level work. (Tr. at 382-83).

On September 12, 2011, Claimant told Dr. Shumate that he continued to have severe right leg pain which caused him to fall several times when his leg "quit working." (Tr. at 380). Claimant was very tearful about not being able to work and indicated that he would like to go back to work, but could not as a result of his pain. (*Id.*) Dr. Shumate discussed treatment options with Claimant, including a spinal cord stimulator or referral for tertiary care; however, Claimant decided to delay exploring those options because he did not have insurance. (*Id.*) An examination of Claimant's extremities showed no edema, and neurological examination revealed deep tendon reflex at 2/4 with a positive straight leg raise at thirty degrees. (*Id.*) Dr. Shumate assessed Claimant with neurofibroma of the right sciatic nerve and depression, and he continued Claimant on his existing medication regimen. (*Id.*)

Claimant again visited Dr. Shumate on November 10, 2011, and indicated that he was doing fairly well except for right leg and back pain. (Tr. at 378). He told Dr. Shumate that his right leg gave out on him at times, which caused him to fall. (*Id.*) Dr. Shumate observed no edema in the extremities and noted that right leg strength was 3/5. (*Id.*) He assessed Claimant with neurofibroma of the right sciatic nerve, low back pain, and chronic strain. (*Id.*) Claimant was administered a Solu-Medrol shot and continued on his medication regimen. (Tr. at 378-79).

On December 23, 2011, Claimant presented to Dr. Shumate with complaints of severe right leg pain indicating that his pain medication helped, but did not provide him

lasting relief. (Tr. at 374). Claimant reported that his last prescription refill was denied because he failed a drug screen. (*Id.*) Claimant denied experiencing back pain at that time; however, he did assert that his leg pain sometimes radiated into his hip and back. (*Id.*) Dr. Shumate observed a new nodule at Claimant's prior surgical area. (*Id.*) He noted that Claimant had not been prescribed Hydrocodone for some time, but he tested positive for it at a recent drug screen. (*Id.*) Claimant insisted that the Hydrocodone came from left over prescriptions. (*Id.*) Dr. Shumate advised Claimant that he would write a final weaning prescription for Oxycodone and then refer Claimant to a pain clinic for possible injections and nerve blocks. (Tr. at 374, 377).

On February 21, 2012, Claimant was seen at Summerville Regional Medical Center for an injury sustained after his legs gave out and he fell. (Tr. at 463). He complained of low back pain and right leg pain. (Tr. at 464, 467). He also reported loss of bowel control when the injury occurred and stated that he always experienced loss of bowel control when he was in pain. (Tr. at 467). Claimant indicated that he had not taken any medications in one month. (*Id.*) Upon examination, Claimant was alert and in no acute distress. (*Id.*) His extremities were observed to be normal. (*Id.*) Lumbar spine tenderness and an antalgic gait were noted. (Tr. at 468). A rectal examination revealed normal tone and sensation. (*Id.*) A CT scan of the lumbar spine showed no evidence of fracture or dislocation. (Tr. at 470). However, there was an irregular density/calcification noted in the region of the medial anterior aspect of the left kidney and paraspinous musculature. (*Id.*) David Maki, D.O., was unsure of the origin, but noted that it could be post-surgical. (*Id.*) Dr. Maki also observed a transitional lumbosacral segment. (*Id.*) Claimant was ultimately assessed with a low back sprain and prescribed Toradol, Norflex, and Ultram. (Tr. at 468-69). He was discharged in stable

condition. (Tr. at 466).

On April 24, 2012, Michael Shawn Bosley, DPT, evaluated Claimant as referred by Dr. Khorshad for complaints of knee pain. (Tr. at 887-90). Claimant informed Mr. Bosley that he had visited Dr. Khorshad for post-surgical issues after tumors were removed by Dr. Goodman. (Tr. at 887). In addition, Claimant reported right hip and back pain that radiated down to his heel. (*Id.*) He described his pain as ten out of ten on the pain scale. (*Id.*) The pain was aggravated with walking, sitting, or standing and was relieved by heat, ice, or medication. (*Id.*) Claimant indicated that he became incontinent with increased pain and that pain in his calf pain interrupted his sleep. (*Id.*) Mr. Bosley was unable to test much of Claimant's right lower extremity due to sensitivity. (Tr. at 887-88). Knee patella mobility and tilt showed bilateral decrease. (Tr. at 888). Muscle tone was decreased in Claimant's right lower extremity from his hip to his ankle, and he experienced tenderness in the entire posterior aspect of his right lower extremity. (*Id.*) Mr. Bosley observed that Claimant ambulated with decreased knee extension and ankle plantar flexion. (*Id.*) He opined that Claimant was not a candidate for physical therapy as he would not be able to tolerate it. (Tr. at 889). Claimant scored a seventy percent on the Modified Oswestry Low Back Questionnaire, which placed him in the "crippled category." (*Id.*) Mr. Bosley believed that Claimant's pain level and limitations prevented effective physical therapy. (*Id.*)

On July 11, 2012, Claimant visited West Virginia University Healthcare and was examined by Trapper Lalli, M.D., for evaluation of his neurofibromas. (Tr. at 891-92). Claimant reported that he had progressed well after his last surgery, which involved the removal of neurofibromas; however, he indicated that since 2011, he had developed worsening pain in his leg that caused him difficulty in ambulating. (Tr. at 891). He

stated that he quit his job because of his medical condition. (*Id.*) In addition, Claimant reported noticing an enlarged mass in the medial side of his right foot. (*Id.*) At that time, Claimant was taking Amitriptyline 25 mg for pain control. (*Id.*) Upon examination, Dr. Lalli observed atrophy of Claimant's right quadriceps and gastroc soleus complex compared to the contralateral side. (Tr. at 892). Claimant retained 4/5 strength within the tib-ant on the right and 4/5 strength with resisted eversion on the right. (*Id.*) Dr. Lalli noted a mass on the medial side of Claimant's right hindfoot, which was very tender to palpation and measured one centimeter in diameter. (*Id.*) Dr. Lalli recorded that Claimant would not put his heel on the ground when ambulating and that he walked on his tip toes on the right leg. (*Id.*) Dr. Lalli reviewed right knee x-rays from January 2011 and an MRI from February 2010, which showed hyperintense masses that were very close to the neurovascular structures in the posterior thigh. (*Id.*) Claimant was assessed with neurofibromas in the posterior thigh and possibly in the medial hindfoot. (*Id.*) Dr. Lalli ordered an MRI of Claimant's right thigh, knee, and hindfoot. (*Id.*) Claimant requested additional pain medication, and Dr. Lalli prescribed Lyrica. (*Id.*)

On August 1, 2012, Claimant was examined by Clinton Garrett Cooper, M.D., for complaints of pain as well as depression and thoughts of suicide, but he denied any suicidal plans. (Tr. at 940). Claimant also reported constant fatigue, increased sleep and irritability, loss of pleasure, feelings of hopelessness, and headaches. (*Id.*) He asserted that his pain was better when prescribed Lyrica 300 mg, but at that time, he was only prescribed Lyrica 75 mg. (*Id.*) Dr. Cooper's examination of Claimant's extremities revealed no edema or cyanosis; however, there was a marked difference in the circumference between Claimant's left leg and right leg. (Tr. at 942). Dr. Cooper observed that Claimant was alert and oriented with normal affect, behavior, memory,

thought content, judgment, and speech. (*Id.*) Dr. Cooper assessed Claimant with neurofibroma and depression. (*Id.*) He noted that an MRI was ordered to assess Claimant's neurofibromas, and he increased Claimant's Lyrica dosage to 300 mg. (*Id.*) As for Claimant's depression, Dr. Cooper indicated that Claimant remained hopeful about his future, and he prescribed Cymbalta. (*Id.*)

On October 3, 2012, Claimant presented to Samuel R. Morris, M.D., at WVU Healthcare. (Tr. at 915). Claimant complained of right leg pain that had caused him to feel depressed. (*Id.*) He reported taking Cymbalta 20 mg twice daily, although he felt it was not helping. (*Id.*) Claimant described his condition as disabling and indicated that it prevented him from working. (*Id.*) Upon examination, Claimant was oriented and distressed. (Tr. at 916). He had normal range of motion in the neck along with normal musculoskeletal range of motion and no sign of edema or tenderness. (*Id.*) Dr. Morris noted right calf atrophy and bilateral hyper-reflexive, but symmetric patellar and Achilles reflexes. (*Id.*) He recorded 5/5 left leg strength and 4/5 right leg strength secondary to pain. (*Id.*) With regard to his psychiatric examination, Dr. Morris found that Claimant's mood, affect, behavior, judgment, and thought content were normal. (*Id.*) Claimant was assessed with neurofibroma and neuropathic pain. (*Id.*) Dr. Morris instructed Claimant to continue using Lyrica and Elavil, and he informed Claimant that he could increase his Cymbalta dosage. (*Id.*) Dr. Morris also referred Claimant to Suncrest Pain Clinic. (*Id.*)

On October 24, 2012, Claimant visited Summersville Regional Medical Center for an MRI of his right femur, right knee, and right foot. (Tr. at 910-12). The MRI of Claimant's right femur revealed significant worsening compared to a prior study in February 2010. (Tr. at 910). Deep neurofibromas in the right thigh were observed,

which had enlarged and had numerous fascicles extending from the upper femur to the level of the knee. (*Id.*) The right knee MRI showed numerous fibromata about the knee and joint effusion; however, there was no definite evidence of a meniscal tear and the ligamentous structures, including collaterals and cruciate, were intact. (Tr. at 911). The MRI of Claimant's right foot revealed no definite evidence of soft tissue lesion, bony abnormality, or fracture. (Tr. at 912). There was some joint effusion in the area of the first metatarsal phalangeal joint and the ankle. (*Id.*)

Claimant returned to WVU Healthcare on November 5, 2012, and was examined by Kim Chong, M.D. (Tr. at 918-19). Claimant complained of constant pain in the right hip on the back of the leg. (Tr. at 918). While Claimant had tried various neuromodulation medications and treatment using heat or cold, he continued to experience constant pain. (*Id.*) Upon examination, Dr. Chong found that Claimant presented with a normal affect and was negative for depression. (*Id.*) Claimant was able to present a neutral stance with unremarkable gait, and he did not require an assistive device to ambulate. (*Id.*) Dr. Chong noted that Claimant had right lower extremity nodules and limited use of that extremity. (*Id.*) Claimant was assessed with right lower extremity pain, status post neurofibroma resections, and component of neuropathic pain. (Tr. at 918-19). Claimant was advised to follow-up as scheduled with orthopedics, and Dr. Chong indicated that he would consider nerve block treatment. (Tr. at 919).

On December 12, 2012, Claimant presented to WVU Healthcare and was examined by Brock Lindsey, M.D. (Tr. at 920). Claimant reported worsening pain and stated that he had to quit his job due to his neurofibromas. (*Id.*) Dr. Lindsey's examination revealed a positive straight leg raise on the right lower extremity, which caused a significant burning sensation down the site of the peronteal distribution. (*Id.*)

Although Claimant did not have a significant foot drop, he did have minor weakness, measured at 4/5, in his tibia. (*Id.*) Dr. Lindsey observed a mass on the medial side of the hindfoot that was tender. (*Id.*) He noted that MRIs of the foot, tibia, and femur showed increased sized neurofibromas along the sciatic nerve and posterior of the thigh. (*Id.*) Dr. Lindsey assessed Claimant with multiple neurofibromas along the sciatic nerve. (*Id.*) He opined that Claimant's treatment option would involve debulking the tumors as there was no way to obtain a wide resection due to the involvement to the sciatic nerve. (*Id.*) He also recommended a needle biopsy of the neurofibromas on the posterior part of Claimant's right thigh to rule out any malignancy. (*Id.*) A few days later, on December 17, 2012, Claimant underwent a needle biopsy of the right thigh. (Tr. at 922-25).

Claimant returned to WVU Healthcare on January 22, 2013 for a follow-up related to his pain caused by multiple right leg neurofibromas. (Tr. at 945). Dr. Cooper noted that Claimant had recently been evaluated by orthopedics and had undergone a biopsy of his right thigh. (*Id.*) Dr. Cooper also recorded that orthopedics believed surgical intervention was not a treatment option and that Claimant would require pain control. (*Id.*) Claimant reported that he had an evaluation scheduled the following week with Beckley Pain Clinic and that his insurance would no longer cover his Lyrica prescription. (*Id.*) Claimant further indicated that his mood had been labile, and he denied experiencing headaches. (*Id.*) Upon examination, Dr. Cooper noted that Claimant was alert, pleasant, and in no apparent distress. (Tr. at 946). Dr. Cooper observed no edema or cyanosis in Claimant's extremities. (*Id.*) He noted a marked difference in the circumference of Claimant's legs, which he attributed to atrophy given Claimant's decreased use of the right leg. (*Id.*) With regard to psychiatric symptoms, Dr. Cooper found that Claimant's affect, behavior, memory, thought content, judgment, and

speech were all normal. (*Id.*) Claimant reported passive thoughts of suicide, but no active ideation. (Tr. at 946-47). He remained hopeful for the future, but wanted to feel more even tempered. (Tr. at 947). Dr. Cooper opined that Claimant's depression was likely due to his chronic pain and prescribed an increase in Cymbalta. (Tr. at 946-47). As for Claimant's neurofibroma, Dr. Cooper discontinued Lyrica and prescribed Neurontin. (Tr. at 946).

On January 29, 2013, Claimant presented to Reinaldo Nodal, RN. (Tr. at 936-39). Claimant was evaluated for complaints of right hip and right leg pain, which he described as constant with an average severity of nine out of ten. (Tr. at 936). Claimant reported that the pain was aggravated with movement and nothing alleviated the pain; however, he did indicate that he received some benefit from narcotic medication. (*Id.*) Claimant denied experiencing depression, anhedonia, or feelings of hopelessness in the two weeks prior to his appointment, and he also denied having any suicidal thoughts. (*Id.*) He reported experiencing right-sided, posteriolateral thigh pain due to neurofibromatosis. (Tr. at 937). Upon examination, Claimant was oriented with no focal defects and appeared to be in no acute distress. (*Id.*) Claimant's extremities exhibited no deformity, clubbing, cyanosis, or edema. (*Id.*) Claimant's cervical, lumbar, and thoracic spine, along with the iliac crest, showed no deformity or tenderness and there appeared full range of motion. (Tr. at 937-38). There was no swelling, ecchymosis, erythema, or step off deformity of Claimant's shoulders. (Tr. at 938). Claimant's right calf muscle was tender with muscle weakness and atrophy noted. (*Id.*) Claimant's gait was unsteady, and he ambulated with difficulty, but he did not use any assistive device. (*Id.*) Mr. Nodal recommended Percocet 7.5 mg and advised Claimant to continue stretching exercises, walking, and range of motion exercises. (*Id.*) Claimant was instructed to follow-up in

thirty days. (Tr. at 939).

Claimant returned to WVU Healthcare on April 12, 2013, for treatment of his pain related to multiple right leg neurofibromas. (Tr. at 948). Claimant reported that he had established care with Beckley Pain Clinic and signed a pain contract, but his follow-up appointment was canceled and he had been unable to contact anyone at the clinic to reschedule. (*Id.*) Claimant reported increased problems with ambulating and requested a cane and an orthopedic in-step. (*Id.*) He informed Dr. Cooper that he was taking Neurontin, but he found it was not as helpful for pain control as Lyrica. (*Id.*) Dr. Cooper observed that Claimant was pleasant, but appeared to be in mild distress and was unable to sit comfortably. (Tr. at 949). Upon examination, Dr. Cooper again noted a marked difference in leg circumference, most likely due to atrophy from decreased use of the right leg. (*Id.*) Claimant's gait was impeded severely due to a limp of his right leg. (*Id.*) Dr. Cooper found that Claimant's affect, behavior, memory, thought content, judgment, and speech were normal. (*Id.*) At the appointment, Dr. Cooper attempted to contact the Beckley Pain Clinic, but was unable to get a response. (*Id.*) He later found out that the Beckley Pain Clinic no longer had an acting physician. (*Id.*) Consequently, Dr. Cooper scheduled an appointment for Claimant with the Charleston Area Medical Center Pain Relief Center ("CAMC Pain Relief Center"). (*Id.*) Claimant was restarted on Lyrica 100 mg three times per day and prescribed Endocet. (*Id.*) Claimant was also prescribed a cane to help him ambulate. (*Id.*) With regard to Claimant's depression, Dr. Cooper noted that Claimant had reported doing well at that time, and he opined that Claimant's depressive symptoms were well controlled on Cymbalta. (*Id.*)

Claimant presented to the CAMC Pain Relief Center on May 23, 2013, for complaints of low back pain and right leg pain extending to the foot. (Tr. at 1012).

Claimant also stated that he experienced neck pain. (*Id.*) Claimant reported that his pain had increased since 2011, and at his appointment, described the pain as a nine out of ten. (*Id.*) Claimant indicated that his pain increased with lying down, sitting, standing, driving, lifting, walking, climbing stairs, and limb position. (Tr. at 1013). The pain decreased with rest, position change, or the application heat or cold. (*Id.*) The treater noted that Claimant's pain was associated with color changes. (*Id.*) Claimant denied bowel or bladder dysfunction. (*Id.*) Claimant informed his treater that he was able to get two hours of sleep at night and was awakened by pain. (Tr. at 1013). Claimant reported that he last worked as a coal miner in May 2011. (Tr. at 1015). The treater noted that Claimant used a cane to ambulate and took sedating medications. (Tr. at 1015-16).

### B. Evaluations and Opinions

On November 15, 2011, Miraflor G. Khorshad, M.D., examined Claimant at the request of the West Virginia Social Security Disability Determination Section. (Tr. at 336-40). Claimant complained of neck, shoulder, back, right leg, and right foot pain. (Tr. at 336). Claimant described the pain in his right leg as sharp and tingling. (*Id.*) He reported problems with sitting, walking, or standing for prolonged time periods. (*Id.*) Claimant's medications at that time included Diflunisal, Lyrica, lorazepam, Amitriptyline, cyclobenzaprine, and Oxycodone/acetaminophen. (*Id.*) During a review of systems, Claimant denied chronic fatigue and chronic headache. (Tr. at 336-37).

Upon examination, Dr. Khorshad noted that Claimant walked with a limp favoring his right leg, but did not use an assistive device. (Tr. at 337). Claimant was able to get on and off of the examination table and to perform a heel/toe maneuver, but he had difficulty sitting and squatting. (*Id.*) Dr. Khorshad found that Claimant had tremors in both hands. (*Id.*) Dr. Khorshad observed no leg or pedal edema, joint effusion, or

joint swelling. (*Id.*) The circumference of Claimant's right calf measured thirty-four centimeters while the left calf measured thirty-eight centimeters. (*Id.*) Neurologically, Dr. Khorshad recorded that Claimant was alert and oriented with reflexes intact. (*Id.*) Dr. Khorshad noted that Claimant was right-hand dominant. (*Id.*) A Jamar Dynamometer Handgrip Test on the right measured at seventy-five, eighty, ninety and ninety while the left measured at fifty-five, sixty, seventy, and seventy-five; however, the unit of measurement for the test is unclear as Dr. Khorshad listed both kilograms and pounds of force next to the test results. (*Id.*) Claimant could fully extend his hands, make a fist, and his fingers could be opposed. (Tr. at 339). Dr. Khorshad observed that Claimant's fine manipulation ability was normal and that his grip strength on the left side was 4/5 while his grip strength on the right side was 3/5. (*Id.*) Claimant's upper extremity strength was 5/5 on the left side and 4/5 on the right side. (*Id.*) Lower extremity strength was 5/5 on the left side and 1/5 on the right side. (Tr. at 340). Right hip forward flexion measured ninety degrees with pain and the left measured at 100 degrees. (*Id.*) Hip abduction on the right measured at six degrees and forty degrees on the left while hip adduction measured zero on the right and twenty degrees on the left. (*Id.*) Dorsiflexion of the right ankle measured zero and the left measured twenty degrees. (*Id.*) Right ankle plantar flexion measured zero and the left measured forty degrees. (*Id.*) Dr. Khorshad found that cervical spine lateral flexion was twenty degrees to both the right and left, flexion was fifty degrees, extension was sixty degrees, and rotation was seventy degrees in both directions. (*Id.*) Claimant's lumbar flexion was ninety degrees, lumbar lateral flexion was twenty-five degrees to both sides, and a seated straight leg raise test was seventy degrees on the right and ninety degrees on the left. (*Id.*) Range of motion in Claimant's wrists, shoulders, elbows, and knees was

normal, but Claimant did report some right shoulder pain. (Tr. at 339).

Dr. Khorshad noted that Claimant's history was positive for a back injury in May 2011 while at work, which caused lumbar pain radiating to the right hip and lower leg. (Tr. at 338). Dr. Khorshad also documented that Claimant reported a prior work injury in October 2008 when a piece of equipment fell on his head and right shoulder. (*Id.*) Claimant described neck and right shoulder pain and numbness after that incident. (*Id.*) Claimant also indicated that he had injured his back while at work in June 2001 when a roof support fell on his head, shoulder, and back. (*Id.*) As for psychiatric symptoms, Claimant reported experiencing feelings of depression since April 2011 due to his injuries and a recent divorce. (*Id.*) Dr. Khorshad diagnosed Claimant with history of neurofibromatosis, right lower leg; situational depression; and history of rotator cuff tear on right shoulder. (*Id.*)

Pedro F. Lo, M.D., completed a Physical Residual Functional Capacity Assessment on November 21, 2011. (Tr. at 343-50). Dr. Lo noted that Claimant's diagnosis included chronic cervical and lumbar strain, and neurofibromatosis. (Tr. at 343). With regard to exertional limitations, Dr. Lo found that Claimant could occasionally lift or carry twenty pounds, frequently lift or carry ten pounds, stand or walk for about six hours in an eight-hour workday, and sit for about six hours in an eight-hour workday. (Tr. at 344). Dr. Lo further opined that Claimant retained unlimited ability to push or pull, including the operation of hand or foot controls. (*Id.*) As to postural limitations, Dr. Lo concluded that Claimant could occasionally climb ramps and stairs, balance, stoop, kneel, crouch, and crawl; however, Claimant could never climb ladders, ropes, or scaffolds. (Tr. at 345). Dr. Lo opined that no manipulative, visual, or communicative limitations were established. (Tr. at 346-47).

Regarding environmental limitations, Dr. Lo determined that Claimant could have unlimited exposure to wetness, humidity, noise, fumes, odors, dusts, gases, and poor ventilation, but Claimant should avoid concentrated exposure to extreme cold, extreme heat, vibration, and hazards, such as machinery or heights. (Tr. at 347). Dr. Lo opined that Claimant's alleged impairments were partially supported by the medical record. (Tr. at 348). He stated that even though there was some range of motion limitation of the lumbar spine and right lower extremity, there appeared to be no significant compromise as to function in those areas. (*Id.*) In addition, Dr. Lo noted that Claimant's right lower extremity strength was found to be 1/5; however, Claimant was able to perform the toe/heel maneuver, get on and off the examining table, and did not require an assistive device to ambulate. (*Id.*) Dr. Lo also observed that Claimant appeared capable of performing the majority of his activities of daily living, which included taking care of his children, cooking, cleaning, doing laundry, washing dishes, driving, shopping, taking care of finances, and talking on the phone. (Tr. at 349-50). Dr. Lo noted that Claimant reported he had some difficulty sleeping, dressing, bathing, using the toilet, handling stress, paying attention, and following directions. (Tr. at 350). In addition to Claimant's activities of daily living, Dr. Lo also summarized treatment records from February 2010, August 2011, and September 2011 along with the results of Dr. Khorshad's examination. (*Id.*) Dr. Lo ultimately opined that Claimant was partially credible and that he was limited to light work. (*Id.*)

Larry J. Legg, M.A., performed a Mental Status Examination for the West Virginia Disability Determination Service on November 21, 2011. (Tr. at 352-55). Mr. Legg noted that Claimant drove himself to the appointment and that he was cooperative during the interview with a serious demeanor. (Tr. at 352). Claimant's posture was

28

judged to be average, and he walked slowly with a slight limp. (*Id.*) Claimant indicated that he had two daughters who he saw at least once each week. (Tr. at 353). Claimant reported several work-related injuries in his fifteen years as a coal miner, which affected his back, neck, shoulders, and legs. (*Id.*) Claimant informed Mr. Legg that his depression began, for the most part, in 2011. (*Id.*) Claimant reported feeling overwhelmed by several surgeries between 2008 and 2009, getting divorced, chronic pain, and losing his job for attending a funeral. (*Id.*) Claimant's psychological symptoms at that time included depression, anxiety, poor concentration and memory, feelings of worthlessness, decreased appetite, decreased sleep, and loss of interest in activities. (*Id.*) He asserted that he had never received outpatient mental health services or been hospitalized for psychiatric or psychological reasons. (Tr. at 353-54). He reported that Dr. Shumate advised him to seek counseling. (Tr. at 353).

Upon examination, Mr. Legg noted that Claimant was motivated, cooperative, and polite. (Tr. at 354). His speech was normal and adequate, and he was oriented. (*Id.*) Mr. Legg recorded that Claimant's affect was flat and his mood was dysphoric. (*Id.*) Claimant's thought process, thought content, psychomotor behavior, judgment, immediate memory, recent memory, remote memory, and persistence were all within normal limits. (*Id.*) Claimant's insight was fair, and he denied any suicidal or homicidal ideation. (*Id.*) Mr. Legg found that Claimant's concentration and pace were mildly deficient. (*Id.*) Based upon clinical observations, Mr. Legg opined that Claimant was mildly deficient in social functioning. (*Id.*) Claimant told Mr. Legg that he got along well with his brother and sometimes saw his parents or other siblings. (*Id.*) Claimant indicated that he rarely left his home and had no close friends, but he enjoyed being around his children. (*Id.*) In describing a typical day, Claimant stated that he spent most

of the day in bed, resting and watching television while trying to stay comfortable. (Tr. at 355). Claimant reported that he only got out of bed to use the bathroom or eat. (*Id.*) Mr. Legg diagnosed Claimant with major depressive disorder, single episode, severe without psychotic features and anxiety disorder, not otherwise specified. (*Id.*) Mr. Legg opined that Claimant's prognosis was fair, and he noted that Claimant was capable of managing his own finances. (*Id.*)

Jeff Harlow, Ph.D., completed a Psychiatric Review Technique on December 13, 2011. (Tr. at 358-71). Dr. Harlow determined that Claimant suffered from a non-severe affective disorder in the form of depressive syndrome as evidenced by sleep disturbance, psychomotor agitation or retardation, decreased energy, difficulty concentrating or thinking, and feelings of guilt and worthlessness. (Tr. at 358, 361). Dr. Harlow further found that Claimant suffered from a non-severe anxiety disorder, not otherwise specified. (Tr. at 358, 363). In analyzing the paragraph B criteria of Listings 12.04 and 12.06, Dr. Harlow opined that Claimant had no limitation in activities of daily living and mild limitation with regard to maintaining social function and maintaining concentration, persistence, or pace. (Tr. at 368). Dr. Harlow noted that there were no episodes of decompensation of extended duration. (*Id.*) In addition, Dr. Harlow found that Claimant did not meet the paragraph C criteria for Listings 12.04 and 12.06. (Tr. at 369). In support of his opinion that Claimant's major depressive and anxiety disorders were not severe, Dr. Harlow stressed that the clinical results of Mr. Legg's consultative evaluation demonstrated that Claimant's key functional capacities were within normal limits or mildly deficient. (Tr. at 370). Dr. Harlow assigned full weight to Mr. Legg's evaluation and found that Claimant's statements about functional capacities were only partially credible as they were inconsistent with the clinical results of the consultative

examination. (*Id.*)

Joseph A. Shaver, Ph.D., completed a Case Analysis on February 13, 2012. (Tr. at 456). After reviewing the case file, Dr. Shaver affirmed Dr. Harlow's Psychiatric Review Technique. (*Id.*) The following day, Curtis Withrow, M.D., completed a Case Analysis. (Tr. at 458). After reviewing the case file, Dr. Withrow affirmed the Physical Residual Functional Capacity Assessment completed by Dr. Lo. (*Id.*)

On March 27, 2012, Tony Goudy, Ph.D., performed a psychological evaluation at the request of Claimant's attorney. (Tr. at 881-86). Claimant reported that he suffered from chronic depression and anxiety. (Tr. at 881). Claimant described experiencing anhedonia, poor appetite, low energy, sleep disruption, forgetfulness, loss of control of emotions, irritability, and suicidal thoughts with no plan. (Tr. at 881-82). Claimant reported he also experienced symptoms of anxiety, including chronic motor tension, autonomic hyperactivity, tension headaches, stiff neck, constant worry, sleep disruption, and difficulty sitting still throughout the day. (Tr. at 882). Claimant told Dr. Goudy that he had suffered from anxiety and depression for two years, and although he had not received any formal mental health treatment, his primary care physician prescribed medication for his symptoms. (*Id.*)

As to Claimant's prior medical history, he reported chronic back pain due to bulging discs and tumors on the sciatic nerve. (*Id.*) He explained that the tumors impacted the way he walked, which caused significant muscle loss in the area of the tumors. (*Id.*) Claimant also complained of bulging discs in his neck and chronic shoulder pain from a torn rotator cuff that occurred several years prior. (*Id.*) In addition, Claimant asserted that his arms often went numb. (*Id.*)

Upon examination, Dr. Goudy noticed significant psychomotor activity with

Claimant constantly fidgeting, appearing uncomfortable while seated, and standing and stretching during the evaluation. (Tr. at 883). Claimant described his mood as "down." (Tr. at 884). Dr. Goudy recorded that Claimant's speech was relevant and coherent. (*Id.*) Claimant's immediate memory was intact; however, Dr. Goudy found that Claimant's recent memory was moderately or markedly impaired given his ability to recall only one of four words after a twenty-minute delay. (*Id.*) Dr. Goudy opined that Claimant's remote memory was not significantly impaired. (*Id.*) During a serial sevens test, Claimant made several errors and took an "inordinate" amount of time to complete the task, which led Dr. Goudy to believe that Claimant's concentration was markedly impaired. (*Id.*) Claimant reported that his pain interfered with his ability to concentrate. (*Id.*) Dr. Goudy recorded that Claimant's judgment was intact and that he demonstrated average intelligence. (*Id.*)

Dr. Goudy administered a Beck Depression Inventory, Second Edition to assess the degree of Claimant's depressive symptoms. (*Id.*) Claimant achieved a score of fifty-six, which reflected severe levels of depression. (*Id.*) Dr. Goudy observed that Claimant's most severe symptoms included sadness, loss of interest, problems with making decisions, loss of energy, sleep disturbance, fatigue, and problems with concentration. (Tr. at 884-85). Claimant was also given the Beck Anxiety Inventory, which is used to assess the severity of anxiety symptoms. (Tr. at 885). Claimant received a score of forty-five, which represented severe levels of anxiety. (*Id.*) Claimant's predominate symptoms included numbness, tingling, wobbliness of his legs, inability to relax, unsteadiness, nervousness, trembling hands, shakiness, racing heart, and sweating. (*Id.*)

Based upon his examination, Dr. Goudy diagnosed Claimant with depressive disorder, not otherwise specified, and generalized anxiety disorder. (*Id.*) Dr. Goudy

opined that Claimant should be assessed under Listings 12.04 and 12.06. (Tr. at 885-86). In relation to the paragraph B criteria for those listings, Dr. Goudy opined that Claimant experienced mild impairment in activities of daily living and maintaining social functioning, and marked impairment in maintaining concentration, persistence, or pace. (Tr. at 886). Dr. Goudy acknowledged that Claimant's mental impairments did not meet either listing; however, he noted that Claimant would benefit from mental health care. (*Id.*) Dr. Goudy opined that Claimant's chronic depression, anxiety, and pain would severely impact his ability to remain on task in a work setting, particularly throughout a full workday or when performing any task that might exacerbate his pain. (*Id.*) Claimant was assigned a Global Assessment of Functioning ("GAF") score of fifty-five.[2] (Tr. at 885).

On February 11, 2013, Dr. Khorshad completed a Medical Review Team form from the West Virginia Department of Health and Human Services, which is somewhat illegible. (Tr. at 933-35). Dr. Khorshad noted that Claimant's statement of incapacity or disability involved fibroma on his sciatic nerve. (Tr. at 933). Dr. Khorshad observed that Claimant's posture evidenced slight rotoscoliosis and he limped on the right side. (*Id.*) Upon examination, Claimant was positive for chronic leg pain, back pain, and what appears to be neurological tremors. (Tr. at 934). Dr. Khorshad diagnosed Claimant with chronic back pain and sciatic nerve fibromatosis. (*Id.*) Dr. Khorshad opined Claimant

---

[2] The Global Assessment of Functioning ("GAF") Scale is a 100-point scale that rates "psychological, social, and occupational functioning on a hypothetical continuum of mental health-illness," but "do[es] not include impairment in functioning due to physical (or environmental) limitations." *Diagnostic Statistical Manual of Mental Disorders*, Am. Psych. Assoc., 32 (4th ed. text rev. 2000) ("DSM–IV"). On the GAF scale, a higher score correlates with a less severe impairment. The GAF scale was abandoned as a measurement tool in the latest edition of the *Diagnostic and Statistical Manual of Mental Disorders* (5th ed. 2013) ("DSM–5"), in part due to its "conceptual lack of clarity" and its "questionable psychometrics in routine practice." DSM–5 at 16. A GAF score between 51 and 60 indicates "[m]oderate symptoms (e.g., flat affect and circumstantial speech, occasional panic attacks) OR moderate difficulty in social, occupational, or school functioning (e.g., few friends, conflicts with peers or co-workers)." DSM–IV at 34.

was unable to work full-time at his customary occupation or like work given his chronic right leg pain and sciatic nerve fibromas. (*Id.*) Additionally, Dr. Khorshad determined that Claimant could not perform other full-time work for at least one year. (*Id.*) Dr. Khorshad indicated that Claimant should avoid prolonged standing or walking at work and that he should be referred for vocational rehabilitation. (Tr. at 934-35).

On April 23, 2013, Casey Vass, Rehabilitation Specialist, performed a Vocational Evaluation as requested by Claimant's attorney. (Tr. at 256-66). Among other credentials, Mr. Vass is a Registered Nurse and Certified Rehabilitation Counselor.[3] (Tr. at 266). Claimant reported to Mr. Vass that he had to sometimes "scoot" down the four steps at his home because his right leg gave out. (Tr. at 256). Claimant further told Mr. Vass that he had fallen three or four times in the past month, which caused him to chip a tooth. (*Id.*) Claimant described being very limited with activities inside the home and indicated that his mother, sister, and girlfriend performed much of the inside and outside chores. (*Id.*) Claimant reported that he possessed a valid driver's license, but did not drive due to the impairment to his right leg. (*Id.*) As to his daily activities, Claimant informed Mr. Vass that he spent most of the day changing positions (e.g. from sitting to standing to walking to lying down) and that his primary hobby was watching television all day. (Tr. at 257). He asserted that he was independent in performing his activities of daily living. (*Id.*) In addition, Claimant stated that he only slept three hours each night, which required him to nap throughout the day. (*Id.*) Claimant insisted that he could not work full time, even in a sedentary job, due to right leg, neck, and back pain, which caused him to constantly change positions; chronic fatigue due to sleep disruption; and

---

[3] Mr. Vass has also been hired by the SSA to testify as an independent vocational expert at administrative hearings. *See Freeman v. Astrue*, No. 2:12-cv-05451, 2014 WL 1329922, at *7 (S.D.W.Va. Mar. 31, 2014); *Gates v. Colvin*, No. 6:12-cv-07860, 2014 WL 1330874, at *10 (S.D.W.Va. Jan. 23, 2014); *Steele v. Astrue*, No. 5:11-cv-84, 2011 WL 7990300, at *1 (N.D.W.Va. Oct. 20, 2011).

lack of energy. (*Id.*) He informed Mr. Vass that he could, at most, sit for twenty to thirty minutes, stand for fifteen to twenty minutes, and walk approximately 150 feet. (*Id.*) Mr. Vass noted that three weeks prior to the evaluation, Dr. Cooper prescribed a cane for Claimant after taking a fall while at the hospital. (Tr. at 258). Claimant complained of tingling in the right leg and episodes of falling when his right leg pain became severe. (*Id.*) Claimant indicated that he was right-hand dominant and could lift five to ten pounds if the object was situated at tabletop level. (*Id.*) Mr. Vass also noted that Dr. Cooper had prescribed Lyrica, Cymbalta, Amitriptyline, and Oxycodone. (Tr. at 259). Claimant indicated that his medication helped to control his pain, but did not eliminate it. (*Id.*) With regard to Claimant's depression, Claimant indicated that his depression stemmed from his constant pain, inability to provide for his family, and inability to participate in recreational activities with his children. (*Id.*) Claimant described experiencing crying episodes and feelings of worthlessness. (*Id.*) Additionally, Mr. Vass noted that Claimant had filed numerous workers' compensation claims and received a fifty-three percent total award from workers' compensation. (*Id.*) Claimant indicated that he was fired from his job at a coal company due to excessive absenteeism, which was attributable to his medical condition and having to take parenting classes. (Tr. at 258).

After extensively reviewing Claimant's medical records from February 2010 through April 2013 and taking into account his own "clinical evaluation" of Claimant, Mr. Vass opined that Claimant was unable to engage in gainful employment at any exertional level. (Tr. at 264). With respect to Claimant's psychiatric symptoms, Mr. Vass highlighted Dr. Goudy's opinion that Claimant had marked impairment of concentration, persistence, or pace as well as chronic depression, anxiety, and pain that

would impact his ability to stay on task. (*Id.*) Mr. Vass opined that Claimant was unable to engage in gainful employment due to these non-exertional limitations alone. (*Id.*) Moreover, Mr. Vass determined that Claimant's exertional limitations caused by his neurofibromas and complaints of constant pain, which Mr. Vass deemed credible, prevented him from engaging in gainful employment at any exertional level. (Tr. at 264-66).

## VI.   <u>Scope of Review</u>

The issue before the Court is whether the final decision of the Commissioner is based upon an appropriate application of the law and is supported by substantial evidence. *See Hays v. Sullivan*, 907 F.2d 1453, 1456 (4th Cir. 1990). In *Blalock v. Richardson,* the Fourth Circuit Court of Appeals defined "substantial evidence" to be:

> [E]vidence which a reasoning mind would accept as sufficient to support a particular conclusion. It consists of more than a mere scintilla of evidence but may be somewhat less than a preponderance. If there is evidence to justify a refusal to direct a verdict were the case before a jury, then there is "substantial evidence."

483 F.2d 773, 776 (4th Cir. 1973) (quoting *Laws v. Celebrezze*, 368 F.2d 640, 642 (4th Cir. 1966)). When examining the Commissioner's decision, the Court does not conduct a *de novo* review of the evidence to ascertain whether the claimant is disabled. *Johnson v. Barnhart*, 434 F.3d 650, 653 (4th Cir. 2005) (citing *Craig v. Chater*, 76 F.3d 585, 589 (4th Cir. 1996)). Instead, the Court's role is limited to insuring that the ALJ followed applicable regulations and rulings in reaching his decision, and that the decision is supported by substantial evidence. *Hays*, 907 F.2d at 1456. If substantial evidence exists, the Court must affirm the Commissioner's decision "even should the court disagree with such decision." *Blalock*, 483 F.2d at 775.

36

## VII.   __Discussion__

### A. The ALJ's RFC Finding

Claimant asserts that the ALJ's RFC finding failed to take into account his manipulative limitations, fatigue, and right leg atrophy. (ECF No. 8 at 5-6, 8-9, 12-13). SSR 96-8p provides guidance on how to properly assess a claimant's RFC, which is the claimant's "ability to do sustained work-related physical and mental activities in a work setting on a regular and continuing basis." SSR 96-8p, 1996 WL 374184, at *1. RFC is a measurement of the ___most___ that a claimant can do despite his or her limitations and is used at steps four and five of the sequential evaluation to determine whether a claimant can still do past relevant work and, if not, whether there is other work that the claimant is capable of performing. *Id.* According to the Ruling, the ALJ's RFC determination requires "a function-by-function assessment based upon all of the relevant evidence of an individual's ability to do work-related activities." *Id.* at *3. Only by examining specific functional abilities can the ALJ determine (1) whether a claimant can perform past relevant work as it was actually, or is generally, performed; (2) what exertional level is appropriate for the claimant; and (3) whether the claimant "is capable of doing the full range of work contemplated by the exertional level." *Id.* Indeed, "[w]ithout a careful consideration of an individual's functional capacities to support an RFC assessment based on an exertional category, the adjudicator may either overlook limitations or restrictions that would narrow the ranges and types of work an individual may be able to do, or find that the individual has limitations or restrictions that he or she does not actually have." *Id.* at *4.

In determining a claimant's RFC, the ALJ "must include a narrative discussion describing how the evidence supports each conclusion, citing specific medical facts (e.g.

laboratory findings) and nonmedical evidence (e.g., daily activities, observations)." *Id.* at *7. Further, the ALJ must "explain how any material inconsistencies or ambiguities in the evidence in the case record were considered and resolved." *Id.* at *7. With allegations of pain or mental distress, the RFC assessment must 1) "contain a thorough discussion and analysis of the objective medical and other evidence, including the individual's complaints of pain and other symptoms and the adjudicator's personal observations, if appropriate;" 2) "include a resolution of any inconsistencies in the evidence as a whole;" and 3) "set forth a logical explanation of the effects of the symptoms, including pain, on the individual's ability to work." *Id.* Moreover, the ALJ must discuss "why reported symptom-related functional limitations and restrictions can or cannot reasonably be accepted as consistent with the medical and other evidence." *Id.* Similarly, the ALJ "must always consider and address medical source opinions" in assessing the claimant's RFC. *Id.* As with symptom allegations, "[i]f the RFC assessment conflicts with an opinion from a medical source, the adjudicator must explain why the opinion was not adopted." *Id.*

In formulating Claimant's RFC, the ALJ did not include any manipulative limitations, concluding that they were not supported by the medical record. (Tr. at 39). Specifically, the ALJ cited Dr. Khorshad's finding in November 2011 that Claimant could fully extend his hands, make a fist, and oppose his fingers. (*Id.*) The ALJ also noted that Dr. Khorshad found Claimant's fine manipulation skills to be normal. (*Id.*) As an additional piece of supportive evidence, the ALJ relied on the findings from Claimant's cervical spine examination in January 2013, which were normal. (*Id.*) However, the ALJ neglected to mention that Dr. Khorshad also recorded in November 2011 his personal observations of tremors in Claimant's hands, as well as decreased grip strength (3/5)

and upper extremity strength (4/5) on Claimant's right side, which is his dominant side.[4] (Tr. at 337, 339). Furthermore, the ALJ overlooked Claimant's report to Dr. Goudy that his arms often went numb, although the ALJ acknowledged Claimant's testimony to that effect at the administrative hearing. (Tr. at 37, 882). Notwithstanding, the ALJ failed to fully address and reconcile the evidence of Claimant's tremors, numbness, and decreased grip strength in his dominant hand. Given Dr. Khorshad's objective findings and Claimant's reports of manipulative impairment, which were consistent with each other but contrary to the RFC finding, the ALJ's failure to comment on this significant evidence calls into question his finding as to manipulative limitations. *Cf. Hardway v. Colvin*, No. 2:14-cv-07339, 2015 WL 1057926, at *23 (S.D.W.Va. Mar. 10, 2015) (stating that ALJ should discuss significantly probative medical evidence that he rejects). While Dr. Lo and Dr. Withrow both opined that Claimant did not possess manipulative limitations, neither physician explained the basis of his opinion in the face of Dr. Khorshad's objective findings. (Tr. at 201, 346, 458).

Whether Claimant has manipulative limitations is particularly important in light of the ALJ's conclusion that Claimant is limited to sedentary work. Since "[m]ost unskilled sedentary jobs require good use of both hands and the fingers," a proper evaluation of Claimant's ability to use his hands is critical to an accurate assessment at step five of the sequential evaluation. SSR 96-9P, 1996 WL 374185, at *8. Social Security Ruling 96-9P explains that "[a]ny significant manipulative limitation of an individual's ability to handle and work with small objects with both hands will result in a significant erosion of the unskilled sedentary occupational base." *Id.* Indeed, the vocational expert testified as to the importance of utilizing one's hands in sedentary work at the

---

[4] The ALJ did mention Claimant's decreased upper extremity and grip strength at step two. (Tr. at 33).

administrative hearing. (Tr. at 75-77). The jobs that the vocational expert opined Claimant could perform require frequent handling, which includes "seizing, holding, grasping, turning or otherwise working primarily with the whole hand or hands." SSR 85-15, 1985 WL 56857, at *7; Dictionary of Occupational Titles ("DOT") 716.684-038, 1991 WL 679267 (polisher); DOT 521.687-086, 1991 WL 674226 (sorter); DOT 726.685-066, 1991 WL 679631 (bonder). Clearly, if Claimant has difficulty grasping, holding, and turning objects with his right hand on a sustained basis, then his ability to frequently handle objects will be negatively impacted. It simply does not follow that Claimant's short-term capacity to make a fist and extend his fingers allows him to frequently handle objects during an eight-hour work day; particularly, when considering that he has documented hand tremors, decreased grip strength, and decreased extremity strength.

The ALJ's written decision is likewise superficial in its discussion of Claimant's reports of fatigue. (Tr. at 40). The ALJ correctly noted that Claimant denied experiencing chronic fatigue during his November 2011 evaluation with Dr. Khorshad; yet, Claimant informed Dr. Goudy in March 2012, Dr. Cooper in August 2012, Mr. Legg in March 2013, and a treater at CAMC Pain Relief Center in May 2013 that he suffered from sleep disturbance or fatigue. (Tr. at 353, 881, 940, 1013). With the exception of Mr. Legg's notation, the ALJ did not reference these consistent reports of lack of sleep and resulting fatigue, thus abdicating his responsibility to explain why four reports relating to the presence of fatigue were less reliable than a single denial in November 2011. It should also be mentioned that, in a Psychiatric Review Technique form, Dr. Harlow found that Claimant met paragraph A criteria for Listing 12.04, in part, due to experiencing sleep disturbance. (Tr. at 361). In addition, Claimant testified at the administrative hearing that a lack of sleep combined with his medications required him

to take naps. While it is true that Claimant denied experiencing medication side effects in September 2011 and February 2012, Cymbalta was added to Claimant's medication regimen after February 2012, and Cymbalta can commonly cause sleepiness or fatigue.[5] (Tr. at 63, 66, 193, 213). Accordingly, the evidence on this issue was plainly ambiguous. Ultimately, the ALJ should have more extensively considered the evidence regarding Claimant's fatigue and its impact on his ability to perform work-related activities on a sustained basis. The ALJ did not address the evidence that supported Claimant's reports; instead, he again chose to focus on the one report that did not substantiate Claimant's allegations.

Finally, with respect to his right leg atrophy, Claimant correctly points out that a number of treaters and examiners documented the condition with objective findings. (Tr. at 892, 916, 938, 946, 949). Dr. Khorshad also recorded that Claimant's right lower extremity strength was only 1/5 in November 2011. (Tr. at 340). Taking into account these findings, the ALJ prohibited Claimant from operating foot controls or pushing and pulling with the right lower extremity. (Tr. at 36). The ALJ further included a sit/stand option in the RFC, prevented Claimant from climbing ladders, ropes, or scaffolds, and limited his exposure to hazards. (*Id.*) Claimant does not describe any additional limitations that the ALJ should have included in the RFC finding as a result of his right leg atrophy; instead, Claimant broadly maintains that the ALJ "failed to consider the objective medical evidence of atrophy" in his right leg. (ECF No. 8 at 12). Contrary to Claimant's contention, the ALJ explicitly considered Claimant's right leg limitations in his RFC discussion. Nevertheless, the ALJ's analysis of Claimant's ambulatory

---

[5] Cymbalta's drug label can be accessed at:
http://www.accessdata.fda.gov/drugsatfda_docs/label/2015/021427s046lbl.pdf  (last  visited  July  23, 2015).

limitations is patently insufficient. In particular, the ALJ discounted Claimant's use of a *prescribed* cane because Claimant obtained the prescription for the cane close in time to his administrative hearing and the use of a cane was "not supported by the evidence of record." (Tr. at 39-40).

Discussing the interplay between sedentary work and hand-held assistive devices, SSR 96-9P provides: "To find that a hand-held assistive device is medically required, there must be medical documentation establishing the need for a hand-held assistive device to aid in walking or standing, and describing the circumstances for which it is needed." 1996 WL 374185, at *7. The Ruling further states that "an individual who uses a medically required hand-held assistive device in one hand may still have the ability to perform the minimal lifting and carrying requirements of many sedentary unskilled occupations with the other hand," and an individual who uses an assistive device due to the impairment of only one lower extremity may "still have the ability to make an adjustment to sedentary work that exists in significant numbers." *Id.* The Ruling advises that, where an assistive device is required, such as a cane, "it may be especially useful to consult a vocational resource in order to make a judgment regarding the individual's ability to make an adjustment to other work." *Id.* Here, the medical evidence demonstrates that Claimant's neurofibromatosis had worsened over time, causing him to suffer numerous falls as a result of his increasing right leg symptoms. (Tr. at 256, 378, 910, 920). Rather than giving this evidence due consideration, the ALJ simply rejected the medical necessity of a cane *prescribed by a treating physician*. In addition to evidence substantiating Claimant's need for a cane, other evidence reflected that Claimant had an unsteady gait. Several treatment records document that Claimant's gait was antalgic, unsteady, or severely impeded. (Tr. at 384, 468, 938, 949). Consequently,

the record should have been more fully developed as to Claimant's need for an assistive device. (Tr. at 949). If indeed a cane was medically required (as Claimant's treating physician believed), then the ALJ should have deferred to the expertise of a vocational expert in determining what impact Claimant's use of a cane had on the sedentary occupational base.[6] *See Penn v. Astrue*, No. 2:09-cv-00169, 2010 WL 547491, at *6 (S.D. Ohio Feb. 12, 2010) (finding that vocational expert testimony was required to determine if and how much the use of cane would erode the sedentary job base).[7]

Although the ALJ's treatment of Claimant's cane usage may not require remand by itself, *see id.* at *6, given the other flaws in the ALJ's RFC analysis described above, the undersigned **FINDS** that the ALJ's RFC finding is **not** supported by substantial evidence and this case should be remanded pursuant to sentence four of 42 U.S.C. § 405(g). In light of Claimant's restriction to sedentary work, his manipulative limitations, fatigue, and reliance on a cane are all key issues. As such, the evidence concerning these issues must be closely and fairly examined and, to the extent necessary, conflicting evidence on the issues must be reconciled by the ALJ.

### B. The ALJ's Evaluation of Opinion Evidence

In his second challenge, Claimant contends that the ALJ improperly weighed the opinions of Dr. Khorshad and Dr. Goudy, who both examined Claimant. (ECF No. 8 at

---

[6] The undersigned recognizes that some district courts within the Fourth Circuit have determined that even if a cane is prescribed by a physician, it may not be "medically required" under SSR 96-9P. *See Morgan v. Comm'r, Soc. Sec.*, No. JKB-13-2088, 2014 WL 1764922, at *1 (D. Md. Apr. 30, 2014); *Timmons v. Colvin*, No. 3:12CV609, 2013 WL 4775131, at *8 (W.D.N.C. Sept. 5, 2013); *Wimbush v. Astrue*, No. 4:10CV00036, 2011 WL 1743153, at *3 (W.D. Va. May 6, 2011). However, as mentioned above, there is evidence in this case that Claimant had problems ambulating that increased over time, including his reports of frequent falls and his worsening neurofibromatosis condition. (Tr. at 378, 463, 910, 920). In any event, considering Claimant's restriction to sedentary work, whether or not Claimant required a cane was crucial to determining what jobs he was capable of performing.

[7] At the administrative hearing, the vocational expert testified that if Claimant were required to "use a cane in the dominant right hand when standing and walking," then he could not perform the jobs identified by the vocational expert and listed in the ALJ's written decision. (Tr. at 73).

9-12). Claimant points out that Dr. Khorshad opined that he would be unable to work full-time given his medical condition. (*Id.* at 10). As for Dr. Goudy, Claimant avers that the ALJ improperly rejected Dr. Goudy's opinion that Claimant experienced marked limitation in maintaining concentration, persistence, or pace, and that Claimant would have difficulty staying on task at work. (*Id.* at 11-12). In addition, Claimant asserts that the ALJ ignored Mr. Vass's opinion that Claimant was unable to engage in gainful activity at any exertional level. (*Id.* at 4, 7-8).

When evaluating a claimant's application for disability benefits, the ALJ "will always consider the medical opinions in [the] case record together with the rest of the relevant evidence [he] receives." 20 C.F.R. §§ 404.1527(b), 416.927(b). Medical opinions are defined as "statements from physicians and psychologists or other acceptable medical sources that reflect judgments about the nature and severity of [a claimant's] impairment(s), including [his] symptoms, diagnosis and prognosis, what [he] can still do despite [his] impairment(s), and [his] physical or mental restrictions." *Id.* §§ 404.1527(a)(2), 416.927(a)(2). Title 20 C.F.R. § 404.1527(c) and 20 C.F.R. § 416.927(c) outline how the opinions of accepted medical sources will be weighed in determining whether a claimant qualifies for disability benefits. In general, an ALJ should give more weight to the opinion of an examining medical source than to the opinion of a non-examining source. *Id.* §§ 404.1527(c)(1), 416.927(c)(1). Even greater weight should be allocated to the opinion of a treating physician, because that physician is usually most able to provide "a detailed, longitudinal picture" of a claimant's alleged disability. *Id.* §§ 404.1527(c)(2), 416.927(c)(2). In the absence of a treating physician's opinion that has been afforded controlling weight, the ALJ must analyze and weigh all of the medical source opinions in the record, taking into account the following factors: (1) length of the

treatment relationship and frequency of evaluation, (2) nature and extent of the treatment relationship, (3) supportability, (4) consistency, (5) specialization, and (6) other factors bearing on the weight of the opinion.[8] *Id.* §§ 404.1527(c)(2)-(6), 416.927(c)(2)-(6). Ultimately, it is the responsibility of the ALJ, not the court, to evaluate the case, make findings of fact, weigh opinions, and resolve conflicts of evidence. *Hays*, 907 F.2d at 1456.

Medical source statements on issues reserved to the Commissioner, however, are treated differently than other medical source opinions. SSR 96-5p, 1996 WL 374183. In both the regulations and SSR 96-5p, the SSA explains that "some issues are not medical issues regarding the nature and severity of an individual's impairment(s) but are administrative findings that are dispositive of a case; i.e., that would direct the determination or decision of disability;" including the following:

> 1. Whether an individual's impairment(s) meets or is equivalent in severity to the requirements of any impairment(s) in the listings;
>
> 2. What an individual's RFC is;
>
> 3. Whether an individual's RFC prevents him or her from doing past relevant work;
>
> 4. How the vocational factors of age, education, and work experience apply; and

---

[8] Although 20 C.F.R. § 404.1527(c) and 20 C.F.R. § 416.927(c) provide that in the absence of a controlling opinion by a treating physician, all of the medical opinions must be evaluated and weighed based upon various factors, the regulations do not explicitly require the ALJ to recount the details of that analysis in the written opinion. Instead, the regulations mandate only that the ALJ give "good reasons" in the decision for the weight ultimately allocated to medical source opinions. *Id.* §§ 404.1527(c)(2), 416.927(c)(2); *see also* SSR 96-2p, 1996 WL 374188, at *5 (stating that when a decision is not fully favorable, "the notice of the determination or decision must contain specific reasons for the weight given to the treating source's medical opinion, supported by the evidence in the case record, and must be sufficiently specific to make clear to any subsequent reviewers the weight the adjudicator gave to the treating source's medical opinion and the reasons for that weight."). "[W]hile the ALJ also has a duty to 'consider' each of the ... factors listed above, that does not mean that the ALJ has a duty to discuss them when giving 'good reasons.' Stated differently, the regulations require the ALJ to consider the ... factors, but do not demand that the ALJ explicitly discuss each of the factors." *Hardy v. Colvin,* No. 2:13–cv–20749, 2014 WL 4929464, at *2 (S.D.W.Va. Sept. 30, 2014).

5. Whether an individual is "disabled" under the Act.

*Id.* at *2. "The regulations provide that the final responsibility for deciding issues such as these is reserved to the Commissioner." *Id.* As such, a medical source statement on an issue reserved to the Commissioner is never entitled to controlling weight or special significance, because "giving controlling weight to such opinions would, in effect, confer upon the [medical] source the authority to make the determination or decision about whether an individual is under a disability, and thus would be an abdication of the Commissioner's statutory responsibility to determine when an individual is disabled." *Id.* at *2. Still, these opinions must always be carefully considered, "must never be ignored," and should be assessed for their supportability and consistency with the record as a whole. *Id.* at *3.

The Commissioner may also use evidence from other sources, such as rehabilitation specialists, "to show the severity of the individual's impairment(s) and how it affects the individual's ability to function." SSR 06-03P, 2006 WL 2329939, at *2; *see also* 20 C.F.R. §§ 404.1513(d), 416.913(d). Social Security Ruling 06-03P sets forth the SSA's policy on how opinion evidence from medical sources that are not acceptable sources, and non-medical sources, should be considered on the issue of disability. The Ruling makes a distinction between types of "other sources," noting that there are health care providers, who are not "acceptable medical sources," but treat the claimant's medical conditions, and there are non-medical sources, like teachers and rehabilitation counselors, who spend substantial time with the claimant in a professional capacity. As the Ruling explains, both types of sources may provide relevant evidence and have useful opinions:

> With the growth of managed health care in recent years and the emphasis on containing medical costs, medical sources who are not "acceptable medical sources," such as nurse practitioners, physician assistants, and licensed clinical social workers, have increasingly assumed a greater percentage of the treatment and evaluation functions previously handled primarily by physicians and psychologists. Opinions from these medical sources, who are not technically deemed "acceptable medical sources" under our rules, are important and should be evaluated on key issues such as impairment severity and functional effects, along with the other relevant evidence in the file.

> "Non-medical sources" who have had contact with the individual in their professional capacity, such as teachers, school counselors, and social welfare agency personnel who are not health care providers, are also valuable sources of evidence for assessing impairment severity and functioning. Often, these sources have close contact with the individuals and have personal knowledge and expertise to make judgments about their impairment(s), activities, and level of functioning over a period of time.

2006 WL 2329939, at *3. The Ruling additionally provides guidance on how the opinions of these other sources should be weighed, stating that the ALJ should consider the same factors that apply to the opinions of "acceptable medical sources," including: (1) the length of time the source has known the claimant and the frequency of their contact; (2) the consistency of the source's opinion with the other evidence; (3) the degree to which the source provides supportive evidence; (4) how well the source explains his or her opinion; (5) whether the source has an area of specialty or expertise related to the claimant's impairments; and (6) any other factors tending to support or refute the opinion. *Id.* at *4. Not every factor applies in every case, and "[e]ach case must be adjudicated on its own merits based on a consideration of the probative value of the opinions and a weighing of all the evidence in that particular case." *Id.* at *5.

Furthermore, the Ruling discusses how the ALJ should address other source opinions in the written decision, indicating that "the case record should reflect the ***consideration*** of opinions from medical sources who are not 'acceptable medical

47

sources' and from 'non-medical sources' who have seen the claimant in their professional capacity." *Id.* at \*6 (emphasis added). However, the Ruling acknowledges that "there is a distinction between what an adjudicator generally must consider and what the adjudicator must explain in the disability determination." *Id.* In general, an ALJ "should explain the weight given to opinions from these 'other sources,' or otherwise ensure that the discussion of the evidence in the determination or decision allows a claimant or subsequent reviewer to follow the adjudicator's reasoning, *when such opinions may have an effect on the outcome of the case." Id.* at \*6 (emphasis added); *see also Pack v. Colvin*, No. 2:13-25249, 2014 WL 6607019, at \*20-\*21 (S.D.W.Va. Nov. 19, 2014). The Ruling requires the ALJ to apply a common sense standard. For example, in an atypical case, when an "other source" opinion is given more weight than a "treating physician" opinion, and the decision is not fully favorable to the claimant, the ALJ **must** explain the reasons for the weight given to the two opinions. SSR 06-03P, 2006 WL 2329939, at \*6. On the other hand, the Ruling implicitly allows the ALJ leeway not to discuss an opinion from an "other source" that is duplicative or cumulative of opinions already addressed in the decision, that is tangential to the outcome, or that is integrated or adopted in another opinion explicitly weighed by the ALJ. *See, e.g., Love-Moore v. Colvin,* No. 7:12–CV–104–D, 2013 WL 5366967, at \*11 (E.D.N.C. Aug. 30, 2013) (holding that "the language in SSR 06–03p regarding what must be spelled out in the ALJ's opinion is more precatory than mandatory.") This interpretation of the Ruling is consistent with the general principle that although the ALJ is required to consider all of the evidence submitted on behalf of a claimant, "[t]he ALJ is not required to discuss all evidence in the record." *Aytch v. Astrue,* 686 F. Supp. 2d 590, 602 (E.D.N.C. 2010); *see also Dyer v. Barnhart,* 395 F.3d

1206, 1211 (11th Cir. 2005) (explaining there "is no rigid requirement that the ALJ specifically refer to every piece of evidence in his decision"). Indeed, "[t]o require an ALJ to refer to every physical observation recorded regarding a Social Security claimant in evaluating that claimant's ... alleged condition[s] would create an impracticable standard for agency review, and one out of keeping with the law of this circuit." *White v. Astrue*, No. 2:08-CV-20, 2009 WL 2135081, at *4 (E.D.N.C. July 15, 2009).

In addressing Dr. Khorshad's opinion, the ALJ recognized that Dr. Khorshad had determined that Claimant was unable to work full-time due to his medical condition. (Tr. at 41). The ALJ assigned Dr. Khorshad's opinion no weight for three reasons. First, the ALJ found that the opinion was inconsistent with the medical record. Second, the ALJ discounted the opinion based on his belief that Claimant visited Dr. Khorshad for the purpose of obtaining "a medical card." (*Id.*) Third, the ALJ pointed out that Dr. Khorshad's opinion concerned an issue reserved to the Commissioner. (*Id.*)

To the extent that Claimant argues that the ALJ failed to consider Dr. Khorshad's opinion that Claimant was prevented from engaging in full-time work, he is obviously mistaken. The ALJ discussed Dr. Khorshad's opinion, but found it was entitled to no weight for the reasons stated above. Furthermore, contrary to Claimant's contention, the ALJ correctly found that Dr. Khorshad's opinion encroached on an issue reserved to the Commissioner. SSR 96-5P, 1996 WL 374183, at *2. Nonetheless, "[i]f the case record contains an opinion from a medical source on an issue reserved to the Commissioner, the adjudicator must evaluate all the evidence in the case record to determine the extent to which the opinion is supported by the record." *Id.* at *3. Given the undersigned's recommendation that the case be remanded, Dr. Khorshad's opinion should be reconsidered below to determine whether any additional evidence, or important

evidence not discussed by the ALJ, supports Dr. Khorshad's finding.

With respect to Dr. Goudy, the ALJ rejected his opinion that Claimant's concentration, persistence, or pace was markedly impaired for a number of reasons. (Tr. at 39, 40-41). First, the ALJ assigned no weight to Dr. Goudy's opinion because the record as a whole, including psychological consultative examination findings, did not support the opinion. (Tr. at 39). The ALJ also noted at step three that Claimant was able to respond to questions appropriately "with no overt lapses in concentration" at the administrative hearing and that a field office employee perceived no problems with Claimant's concentration during an initial interview. (Tr. at 35). Furthermore, the ALJ emphasized that Claimant could watch television, read short passages, and finish tasks with breaks. (*Id.*) Second, the ALJ pointed out that Dr. Goudy assigned a GAF score of fifty-five at the examination, reflecting only moderate symptoms or limitations; although, the ALJ acknowledged that a one-time GAF score is of "limited evidentiary value" since it is only a "snapshot" of an impairment. (Tr. at 40-41). Third, the ALJ found that Dr. Goudy seemed to "uncritically accept" Claimant's subjective reports of his symptoms, which the ALJ considered to be unreliable. (Tr. at 41). Finally, the ALJ stressed that Claimant visited Dr. Goudy after being referred by his attorney and that Dr. Goudy was presumably being paid for generating his report. (*Id.*)

The undersigned **FINDS** that the ALJ offered good reasons for assigning no weight to Dr. Goudy's opinion regarding Claimant's concentration, persistence, or pace, and that the ALJ's determination is supported by substantial evidence. As the ALJ recognized, the record as a whole, including Claimant's reports, Mr. Legg's findings, and the other opinion evidence, did not support Dr. Goudy's conclusion. At step two, the ALJ noted that Mr. Legg found, after examining Claimant, that his concentration and

pace were only mildly deficient while his persistence was within normal limits. (Tr. at 33). At step three, the ALJ stressed that both Dr. Harlow and Dr. Shaver found that Claimant experienced only mild difficulty in concentration, persistence, or pace. (Tr. at 34). Furthermore, the ALJ appropriately relied on Claimant's reported ability to watch television, read short passages, and finish tasks with breaks as some evidence demonstrating an aptitude to maintain concentration, persistence, or pace above a marked level of impairment. In addition, Dr. Goudy's own findings were somewhat inconsistent with his opinion. While the ALJ appropriately appreciated the limited value of a single GAF score, such a score can be important in assessing the internal consistency of an examiner's opinion. *See Veal v. Comm'r, Soc. Sec. Admin.*, No. SAG-12-2619, 2013 WL 5308292, at *3 (D. Md. Sept. 19, 2013); *Hawks v. Astrue*, No. 5:08-00837, 2009 WL 3245267, at *10 (S.D.W.Va. Sept. 30, 2009). Here, Dr. Goudy assigned Claimant a GAF score of fifty-five, which indicates *only* "[m]oderate symptoms (e.g., flat affect and circumstantial speech, occasional panic attacks) OR moderate difficulty in social, occupational, or school functioning (e.g., few friends, conflicts with peers or co-workers)," DSM-IV (revised), yet found Claimant to have marked impairment in a significant functional area. Accordingly, the GAF score assigned by Dr. Goudy at the examination to some extent belies his opinion as to Claimant's ability to maintain concentration, persistence, or pace.[9]

Finally, with respect to Mr. Vass's opinion, Claimant correctly notes that the ALJ failed to discuss the vocational evaluation performed by Mr. Vass in the written decision. After interviewing Claimant, reviewing his employment and educational

---

[9] The ALJ ultimately found that Claimant experienced moderate limitation in maintaining concentration, persistence, or pace, and restricted Claimant to work that involved understanding, remembering, and carrying out simple instructions. (Tr. at 35-36).

history, and thoroughly examining his medical records, Mr. Vass opined that Claimant was unable to engage in gainful employment based on his complaints of pain, non-exertional limitations, and exertional limitations. (Tr. at 265). While Mr. Vass's conclusion was based in part on Dr. Goudy's opinion, which the ALJ appropriately rejected, Mr. Vass also determined that Claimant's exertional limitations and pain, in combination or alone, would prevent Claimant from working. (*Id.*) In support of his opinion, Mr. Vass cited medical findings of right leg atrophy, positive straight leg raise tests, and an MRI showing that Claimant's neurofibromatosis condition was worsening in October 2012. (Tr. at 265-66). Mr. Vass also noted that Claimant was prescribed a cane. (Tr. at 264). Furthermore, Mr. Vass indicated that he found Claimant's consistent complaints of pain to be credible, based on the objective medical findings. (Tr. at 265).

As discussed above, Mr. Vass's opinion constitutes an "other source" opinion. As such, the ALJ may consider the opinion, and if it would "have an effect on the outcome of the case," then the ALJ should "should explain the weight given to [the] opinion[] ... or otherwise ensure that the discussion of the evidence in the determination or decision allows a claimant or subsequent reviewer to follow the adjudicator's reasoning." SSR 06-3p, 2006 WL 2329939, at *6. When an ALJ states that the entire record was considered, as he did here, a court must take the ALJ at his word absent contrary evidence. *Reid v. Comm'r of Soc. Sec.*, 769 F.3d 861, 865 (4th Cir. 2014); (Tr. at 36). Notwithstanding, district courts within the Fourth Circuit have ordered remand in cases where the opinion of a rehabilitation counselor was not discussed by the ALJ. *Dutton v. Colvin*, No. 1:14-cv-1779-BHH, 2015 WL 1733799, at *11-*14 (D.S.C. Apr. 16, 2015); *Jones v. Colvin*, No. 5:13-CV-27-FL, 2014 WL 309415, at *5-*7 (E.D.N.C. Jan. 28, 2014); *Miller v. Astrue*, No. 7:09–CV–115–FL, 2010 WL 3734027, at *4 (E.D.N.C. Sept. 21, 2010). *But*

*see Grindstaff v. Astrue*, No. 08-3367-TLW-BHH, 2010 WL 569660, at *8 (D.S.C. Feb. 12, 2010) (affirming Commissioner's decision where ALJ failed to discuss rehabilitation counselor's opinion). Other federal courts have reached varying results where the opinion of a rehabilitation counselor is not discussed in the written decision. *Compare Weimer v. Callahan*, 124 F.3d 215, 1997 WL 577219, at *1-*2 (9th Cir. Sept. 12, 1997) (unpublished table decision) (declining to remand where ALJ failed to give reasons for rejecting report of independent vocational evaluator because report was not medical report and was controverted by medical evidence), *and Goncalves v. Astrue*, 780 F. Supp. 2d 144, 148-49 (D. Mass. 2011) (finding that failure to discuss vocational rehabilitation counselor's opinion did not warrant remand as ALJ retained discretion to consider opinion and opinion was "largely" based on opinion of physician that ALJ rejected), *with Olson v. Colvin*, No. 5:14-CV-06065-NKL, 2015 WL 1457440, at *9 (W.D. Mo. Mar. 30, 2015) (finding that ALJ should have evaluated rehabilitation counselor's opinion and instructing ALJ to do so on remand), *and White v. Colvin*, No. 12-3073, 2013 WL 3946755, at *4-*5 (C.D. Ill. Aug. 1, 2013) (remanding decision where ALJ failed to "minimally address" why he rejected vocational rehabilitation counselor's opinion that claimant could not work). In this case, the ALJ should, at a minimum, have discussed Mr. Vass's detailed evaluation given his extensive experience in the area and the significance of the information contained in his report. Therefore, on remand, the undersigned **FINDS** that the ALJ should address Mr. Vass's report and opinions and more fully analyze the clinical evidence supplied by Dr. Khorshad.

### C. The ALJ's Credibility Analysis

In his third challenge to the Commissioner's decision, Claimant asserts that the ALJ erred when he found that Claimant's report of his symptoms was less than fully

credible. (ECF No. 8 at 6, 8-9, 11). Under the Social Security rulings and regulations, an ALJ is obliged to use a two-step process when evaluating the credibility of a claimant's subjective statements regarding the effects of his or her symptoms. 20 C.F.R. §§ 404.1529, 416.929. First, the ALJ must consider whether the claimant's medically determinable medical and psychological conditions could reasonably be expected to produce the claimant's symptoms, including pain. *Id.* §§ 404.1529(a), 416.929(a). In other words, a claimant's "statement about his or her symptoms is not enough in itself to establish the existence of a physical or mental impairment or that the individual is disabled." SSR 96-7p, 1996 WL 374186, at *2. Instead, evidence of objective "[m]edical signs and laboratory findings, established by medically acceptable clinical or laboratory diagnostic techniques" must be present in the record and must demonstrate "the existence of a medical impairment(s) which results from anatomical, physiological, or psychological abnormalities and which could reasonably be expected to produce the pain or other symptoms alleged." 20 C.F.R. §§ 404.1529(b), 416.929(b).

Second, after establishing that the claimant's conditions could be expected to produce the alleged symptoms, the ALJ must evaluate the intensity, persistence, and severity of the symptoms to determine the extent to which they prevent the claimant from performing basic work activities. *Id.* §§ 404.1529(a), 416.929(a). If the intensity, persistence, or severity of the symptoms cannot be established by objective medical evidence, the ALJ must assess the credibility of any statements made by the claimant to support the alleged disabling effects. SSR 96-7P, 1996 WL 374186, at *2. In evaluating the credibility of a claimant's statements, the ALJ must consider "all of the relevant evidence," including: the claimant's history; objective medical findings obtained from medically acceptable clinical and laboratory diagnostic techniques; statements from the

claimant, treating sources, and non-treating sources; and any other evidence relevant to the claimant's symptoms, such as, evidence of the claimant's daily activities, specific descriptions of symptoms (location, duration, frequency and intensity), precipitating and aggravating factors, medication or medical treatment and resulting side effects received to alleviate symptoms, and other factors relating to functional limitations and restrictions due to the claimant's symptoms. 20 C.F.R. §§ 404.1529(c)(1)-(3), 416.929(c)(1)-(3); *see also Craig*, 76 F.3d at 595; SSA 96-7P, 1996 WL 374186, at *4-5. In *Hines v. Barnhart*, the Fourth Circuit stated that:

> Although a claimant's allegations about her pain may not be discredited solely because they are not substantiated by objective evidence of the pain itself or its severity, they need not be accepted to the extent they are inconsistent with the available evidence, including objective evidence of the underlying impairment, and the extent to which that impairment can reasonably be expected to cause the pain the claimant alleges she suffers.

453 F.3d at 565 n.3 (citing *Craig*, 76 F.3d at 595). Thus, while the ALJ may not reject a claimant's allegations of intensity and persistence solely because the available objective medical evidence does not substantiate the allegations, the lack of objective medical evidence is one factor that may be considered by the ALJ. SSR 96-7P, 1996 WL 374186, at *6.

SSR 96-7p provides further guidance on how to evaluate a claimant's credibility. For example, "[o]ne strong indication of the credibility of an individual's statements is their consistency, both internally and with other information in the case record." *Id.* at *5. Likewise, a longitudinal medical record "can be extremely valuable in the adjudicator's evaluation of an individual's statements about pain or other symptoms," as "[v]ery often, this information will have been obtained by the medical source from the individual and may be compared with the individual's other statements in the case

record." *Id.* at *6-7. A longitudinal medical record demonstrating the claimant's attempts to seek and follow treatment for symptoms also "lends support to an individual's allegations ... for the purposes of judging the credibility of the individual's statements." *Id.* at *7. On the other hand, "the individual's statements may be less credible if the level or frequency of treatment is inconsistent with the level of complaints." *Id.* Ultimately, the ALJ "must consider the entire case record and give specific reasons for the weight given to the individual's statements." *Id.* at *4. Moreover, the reasons given for the ALJ's credibility assessment "must be grounded in the evidence and articulated in the determination or decision." *Id.*

When considering whether an ALJ's credibility determination is supported by substantial evidence, the Court will not replace its own credibility assessment for that of the ALJ; rather, the Court must scrutinize the evidence to determine if it is sufficient to support the ALJ's conclusions. In reviewing the record for substantial evidence, the Court does not re-weigh conflicting evidence, reach independent determinations as to credibility, or substitute its own judgment for that of the Commissioner. *Hays*, 907 F.2d at 1456. Moreover, because the ALJ had the "opportunity to observe the demeanor and to determine the credibility of the claimant, the ALJ's observations concerning these questions are to be given great weight." *Shively v. Heckler*, 739 F.2d 987, 989 (4th Cir. 1984).

Here, the ALJ scrutinized Claimant's allegations of his symptoms using the two-step process required by the regulations. First, the ALJ determined that Claimant's medically determinable impairments could reasonably be expected to cause his alleged symptoms. (Tr. at 37). Second, the ALJ concluded that Claimant's statements regarding the intensity, persistence, and limiting effects of his symptoms were not entirely

credible. (*Id.*) The ALJ provided a number of reasons in support of his credibility finding. First, the ALJ stressed that Claimant had "provided conflict[ing] information regarding his past work." (Tr. at 39). Specifically, the ALJ noted that Claimant had reported that he was either fired or quit his job due to his impairments, but informed Mr. Legg that he lost his job because he missed work to attend a funeral. (*Id.*) Second, the ALJ found that the medical evidence did not support the severity of his alleged impairments of the right shoulder, neck, and back, and that these conditions were treated, if at all, conservatively with pain medications. (Tr. at 38-40). Specifically, the ALJ noted that Claimant's shoulders were examined in January 2013 and found to be normal. (Tr. at 38). As for Claimant's back impairment, the ALJ emphasized Claimant's report to Dr. Shumate in December 2011 that his symptoms had improved with medication and that he was not experiencing back pain at that time. (Tr. at 39). The ALJ also noted that a CT scan of the lumbar spine in 2012 showed no acute or severe canal or neuroforaminal stenosis. (*Id.*) In relation to Claimant's neck impairment, the ALJ cited a January 2013 examination of his cervical spine that resulted in normal findings. (*Id.*) Third, the ALJ found that Claimant's complaints of pain were inconsistent and that he requested a cane shortly before the administrative hearing even though he had alleged disabling right lower extremity pain since May 2011. (Tr. at 39-40). Fourth, the ALJ found that Claimant reported needing to lie down during the day, but denied experiencing chronic fatigue at an examination in November 2011. (Tr. at 40). Relatedly, the ALJ noted that Claimant's treatment records did not contain evidence that he experienced any medication side effects. (*Id.*) Fifth, the ALJ determined that Claimant had minimized his activities of daily living without justification. (*Id.*) Sixth, the ALJ observed that Claimant had "obtained a medical card," but failed to seek professional

mental health treatment. (*Id.*) Finally, after analyzing the opinion evidence regarding Claimant's impairments, the ALJ concluded that Claimant's "subjective symptoms lack credibility to the extent that they purport to described a condition of disability for Social Security purposes." (Tr. at 40-41).

The written decision reflects that the ALJ thoroughly considered Claimant's credibility using many of the factors described above. The ALJ accurately pointed out that Claimant was inconsistent in explaining why he lost his job in the coal mining industry. (Tr. at 258, 354, 891, 920). Moreover, the ALJ appropriately recognized that Claimant had not sought treatment for some of his health issues, although he presumably had the ability to do so. In addition, the ALJ aptly noted that Claimant's neck and back conditions were treated relatively conservatively. Notwithstanding, there are some aspects of the ALJ's credibility analysis that should be reconsidered on remand. First, the ALJ found that Claimant's complaints of pain with regard to his neurofibromatosis were inconsistent; however, the ALJ failed to cite any evidence supporting his finding of inconsistency. On the contrary, the medical records summarized above indicate that Claimant consistently reported complaints of right leg or right hip pain due to neurofibromas and that pain medication provided only temporary relief. Moreover, according to an orthopedist, surgical intervention to relieve Claimant's symptoms was not feasible given the risks associated with additional surgery, and consequently, Claimant was limited to more conservative treatment measures. Second, the ALJ also failed to provide support for his conclusion that Claimant's report of fatigue was incredible, other than a single denial of experiencing fatigue in November 2011. Finally, as discussed above, Claimant's cane usage was inadequately addressed in the written decision, and therefore, it does not provide a sound basis for discrediting

58

Claimant's allegations.[10]  Therefore, the undersigned **FINDS** that, on remand, the ALJ should revisit Claimant's complaints of pain and reassess whether Claimant's cane usage should indeed reflect poorly on his credibility.[11]

## VIII.  <u>Recommendations for Disposition</u>

Based on the foregoing, the undersigned United States Magistrate Judge respectfully **PROPOSES** that the presiding District Judge confirm and accept the findings herein and **RECOMMENDS** that the District Judge **GRANT** Plaintiff's Motion for Judgment on the Pleadings, to the extent that it requests remand, (ECF No. 7); **DENY** Defendant's request to affirm the decision of the Commissioner, (ECF No. 9); **REVERSE** the final decision of the Commissioner; **REMAND** this matter pursuant to sentence four of 42 U.S.C. § 405(g) for further administrative proceedings consistent with this PF&R; and **DISMISS** this action from the docket of the Court.

The parties are notified that this "Proposed Findings and Recommendations" is hereby **FILED**, and a copy will be submitted to the Honorable Thomas E. Johnston, United States District Judge. Pursuant to the provisions of Title 28, United States Code, Section 636(b)(1)(B), and Rules 6(d) and 72(b), Federal Rules of Civil Procedure, the

---

[10] Claimant's consistent reports of pain and fatigue also impact the ALJ's finding that Claimant minimized his activities of daily living without reason.

[11] While lengthy discussion of Claimant's fourth challenge to the Commissioner's decision will not aid the ALJ on remand, the undersigned notes that Claimant's argument is without merit. Claimant asserts that the ALJ erred when he concluded that the number of jobs identified by the vocational expert at the administrative hearing was significant. The vocational expert testified that there were 46,000 jobs nationally and 1500 jobs regionally for a polisher; 27,000 jobs nationally and 1475 jobs regionally for a sorter; and 45,000 jobs nationally and 1025 jobs regionally for a bonder. (Tr. at 72). The ALJ incorporated these figures into his written decision. (Tr. at 42). The Fourth Circuit has recognized that 110 jobs in a given region may constitute a significant number of jobs as required by the regulations. *Hicks v. Califano*, 600 F.2d 1048, 1051 n. 2 (4th Cir.1979); *see also Guiton v. Colvin*, 546 F. App'x 137, 142 (4th Cir. 2013) (recognizing *Hicks* found 110 jobs in claimant's state to be significant number of jobs); *Koonce v. Apfel*, 166 F.3d 1209, 1999 WL 7864, at *5 (4th Cir. Jan. 11, 1999) (unpublished table decision) (holding claimant's concession that hundreds of jobs were available defeated claim related to significant number of jobs); *Hyatt v. Apfel*, 153 F.3d 720, 1998 WL 480722, at *3 (4th Cir. Aug. 6, 1998) (unpublished table decision) (holding 650 jobs in claimant's state was significant number of jobs).

parties shall have fourteen days (filing of objections) and three days (mailing) from the date of filing this "Proposed Findings and Recommendations" within which to file with the Clerk of this Court, specific written objections, identifying the portions of the "Proposed Findings and Recommendations" to which objection is made, and the basis of such objection. Extension of this time period may be granted by the presiding District Judge for good cause shown.

Failure to file written objections as set forth above shall constitute a waiver of *de novo* review by the District Court and a waiver of appellate review by the Circuit Court of Appeals. *Snyder v. Ridenour*, 889 F.2d 1363 (4th Cir. 1989); *Thomas v. Arn*, 474 U.S. 140 (1985); *Wright v. Collins*, 766 F.2d 841 (4th Cir. 1985); *United States v. Schronce*, 727 F.2d 91 (4th Cir. 1984). Copies of such objections shall be provided to the opposing party, Judge Johnston, and Magistrate Judge Eifert.

The Clerk is directed to file this "Proposed Findings and Recommendations" and to provide a copy of the same to counsel of record.

**FILED:**  July 28, 2015

Cheryl A. Eifert
United States Magistrate Judge